## THE BENALLA.

## THE FRED B. DALZELL.

## BUSH TERMINAL CO. v. PENINSULAR & ORIENTAL STEAM NAV. CO.

District Court, S. D. New York.
Feb. 28, 1921.

Park & Mattison, of New York City (Samuel Park, of New York City, of counsel), for libelant.

Lord, Day & Lord and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City (Allan B. A. Bradley and L. De Grove Potter, both of New York City, of counsel), for the Benalla.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for the Fred B. Dalzell.

L. HAND, District Judge (after stating the facts as above).

No excuse is made or is possible for the navigation of the Dalzell. Not only was her lookout wholly inattentive, but her pilot must have been equally negligent, for although he could not see off on his starboard hand, it is inconceivable that he should have been paying any attention whatever, or he would have heard the continuously repeated signals from the Benalla. The case, therefore, presents the strongest possible ground for the application of the well-known rule in The Chicago (C. C. A.) 125 F. 712, The Transfer No. 8 (C. C. A.) 96 F. 253, and The Delaware, 161 U. S. 459, 16 S. Ct. 516, 40 L. Ed. 771, that where the fault of one vessel is glaring, the fault of the other will be closely scrutinized before she is herself held at fault.

Nevertheless, the undisputed facts in this case seem to me to make it impossible to excuse the Benalla. I do not forget the difficulties under which she was. There is perhaps no position so trying to a navigator as that of a privileged vessel obliged to hold her course and speed, and yet continually approaching the burdened vessel, which disregards her own duties. Yet in this aspect the case is quite similar to that of Yang-Tsze Ins. Ass'n v. Furness, Withy & Co. (The Pomaron), 215 F. 859 (C. C. A.) in which the Alleghany, the burdened vessel, had no one on the bridge, and was steaming along without seeing or attending to the Pomaron. Yet the Pomaron in that case was held for a relatively trivial deviation from the starboard hand rule, because she could not show that it did not contribute to the eventual collision.

The most unquestioned fault, to my mind, of the Benalla is in the fact that when she determined to act, she did not act properly. I refer to the fact that for an interval of a minute, she stopped her engines and did not reverse. If she had done so at once, the col-

lision would not have happened. As it was, she was nearly stopped in the water and the Dalzell all but crossed her bow. Had she reversed for two minutes instead of one, it is all but demonstrable she would not have hit at all. Mr. Bradley urges that the judgment was in extremis and, the fault of the Dalzell being so gross, I ought not to review the judgment made in such circumstances. But the case is not that. I do not question the time at which the Benalla decided to act; I assume that her pilot was justified in holding on for so long as he did. My complaint is that when he did act, he failed to act as any navigator should have done. There is no possible excuse, so far as I can see, in failing to reverse at once when he decided to check his speed. At that time his duty as privileged vessel was past and he recognized that he must attempt to avoid collision by checking his headway.

The pilot himself admitted as much by testifying before me that there was no interval whatever between his two signals to stop and go full speed astern. He said that the telegraph simply paused for an instant, as it must, between the two orders. But I think that his recollection was clearly erroneous in this regard, for not only does the engine log made at the time show an interval of one minute, but the bridge log shows the same thing. Possibly the difference of one minute is not to be taken literally, yet the recorded difference in time must certainly represent some interval, and the engineer of the Benalla so testified from recollection within a few days after the accident itself. How, then, can I accept the recollection of the pilot, necessarily interested as he was, in the face of contemporaneous testimony and written evidence made at the very moment of the events recorded?

█ The foregoing fault appears to me to rest upon substantially uncontradicted testimony; but the second fault of the Benalla I think is also sufficiently proved, although of it I do not feel so certain. I refer to her change of course to starboard after blowing to the Eleanor Bush. I disregard the testimony of the Bush's master, Hansen, not because I charge him with deliberate misstatement, but because his recollection of the whole event is clearly erroneous. As he remembers it, the two tugs were going straight down the river, and the case was one of head and head passing. It was on his story that the libel was drawn, and the libelant does not attempt to support that version. Moreover,

he did not impress me as an accurate or dependable witness.

It is from the mouths of the Benalla's own crew that I feel the fact to be sufficiently established. The pilot swears that there was no change of course whatever. But as I have said, his testimony was taken nearly three years after the event, has been shown to be inaccurate as to the reversing, and he was necessarily an interested witness. Mr. Clark makes something of the fact that the Benalla's master said that she changed her heading a degree or two, urging that any concession from a master is not to be ignored. Yet I think in reading his testimony as a whole, it must be taken as no more than a statement that the ship would yaw on any course. But the second officer, Free, who was lookout in the eyes of the boat, distinctly testifies that after the first blast to the Bush she ported about a point, and that it was his impression that she did the same thing after the second blast. In this he is corroborated by the fourth officer, Stephenson, who was on the bridge, and who says that on the Benalla's first blast she altered her course ten or fifteen degrees. He does not remember whether there were any orders given to the quartermaster on any of the other signals. The testimony of the quartermaster is somewhat vague, yet he says that the ship was swinging to starboard under a port helm until after one or two of the blasts, when she was steadied. At the time of the collision she was carrying a port helm, but this, he thought, was only to keep her steady. This port helm is not to be confused with the continuous swing to starboard until she was steady.

All these men had never been in this harbor before, and the first two supposed that whenever a ship blew a single blast she would port her helm, that being her duty under the International Rules. Hence Mr. Bradley argues, with much weight I think, that their mistake arose from taking as done that which it was usual to do. I feel the force of this argument very much, and yet the fact remains that Free, though questioned closely, was sure, only ten days after the collision, that he had actually observed her go to starboard at the first blast, though he only assumed that the same thing happened at the second. Moreover, it is to be noticed that Stephenson recollected that at the first blast orders were given by the pilot to the wheel to port. He was standing on the bridge and passing the orders to the telegraph com-

municating with the engine room. I really cannot suppose that this he merely imagined, because he thought it the proper course to pursue, especially as he did not remember any other signal of the kind. Moreover, it seems to me that the quartermaster's story bears them out. He could not say whether the order to port was before he heard the first signals or not, but he was sure that it continued after that and that she steadied later. In the face of this testimony from the steamer herself, how can I refuse to believe that there was a porting after the first blast? I do not think that the subsequent porting is proved.

The only remaining question is whether, at the time the change of course was made, there was "risk of collision," Inland Rules, article 19 (33 USCA § 204) between the Benalla and the Dalzell, and that in turn depends upon their distance apart and their relative speeds. The distance was probably half a mile and the approaching speeds four to five knots for the Dalzell and probably seven for the Benalla, a total of eleven knots or say one thousand feet a minute. That is near enough to put the rules into effect and to establish a mutual duty upon both vessels. Had the Benalla held her course the collision would not have happened, because the change was probably nearly two minutes before the Benalla stopped during all of which time she was at full harbor speed, and, as it was, she nearly cleared the float's stern.

Therefore, in spite of the gross carelessness of the Dalzell, it seems to me that the Benalla was also at fault by clear proof. I may add that in view of the acknowledged recognition by the Benalla of the Dalzell's reckless navigation and of the absence of any lookout, it seems to me antecedently unlikely that two vessels at such moderate speeds should have come together in broad daylight and in unobstructed waters without some fault on both sides. It is no doubt tempting always to visit the entire fault upon the gross offender, and if it were possible to apportion fault, this would be a good case to do so. But I have only to decide whether the Benalla was at any fault, not at how much, and at some fault it appears to me she certainly was.

I assume that no point is made of the departure from the libel, and I treat the case as though the pleadings conformed with the proof. There will be a decree for half damages without costs.