## THE COROZAL.

## THE DANIEL PIERCE.

District Court, S. D. New York.
May 15, 1944.

Maclay, Lyeth & Williams, of New York City (Mark W. Maclay, of New York City, Adelbert G. Straub, Jr., of Jackson Heights, L. I., N. Y., of counsel), for Sinclair Refining Co.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for steamship Corozal.

GODDARD, District Judge.

These are cross suits to recover damages resulting from the collision between the Corozal owned by the Agwilines, Inc., and the Daniel Pierce, owned by the Sinclair Refining Company.

The collision occurred on the evening of August 29, 1942, in the Gulf of Mexico, about twenty miles west of Panama City and some three to five miles off shore. Both vessels were, pursuant to Navy orders, proceeding without lights and under telegraph full speed of approximately 9 to 9½ knots. The Corozal, a single right-handed screw steel cargo vessel, 348 feet long, 47 feet beam, with a full cargo including a deck load, was bound in an easterly direction from Mobile, Alabama, to Port of Spain, Trinidad, on a course 117 degrees true. The Daniel Pierce, a single right-handed screw tanker, 375 feet long, 53 feet beam, was bound generally in a westerly direction from the west coast of Florida to Houston, Texas, with a cargo of oil, and was on a course 285 degrees true.

The night was dark and a rain squall made the visibility poor; wind moderate S.E., sea moderate. At 8:35 p. m. the Corozal time, and 8:31 Pierce time, the two vessels collided. The Corozal's starboard bow collided with the Pierce's starboard side aft of the bridge structure.

The testimony of the Corozal's witnesses is that the master was on the bridge in charge of navigation; a licensed officer was on watch on the bridge; a lookout was stationed on the port and starboard wings of the bridge respectively, and a seaman at the wheel steering; that the master left the bridge shortly after 8:30 o'clock; that when he arrived at the bottom of the stairs, the watch officer and one of the lookouts, both on the port wing of the bridge, observed about the same time a dark object which proved to be the Pierce about three-quarters of a point on the port bow, estimated at one-third of a mile distant; that the Corozal's rudder was immediately ordered hard right, but before the order was fully executed a two blast signal was heard from the Pierce; that the Corozal immediately put her rudder hard left and sounded a two blast signal followed by a danger

signal and stopped her engines. Shortly afterwards the outline of the Pierce could be seen and she appeared to be crossing the Corozal's bow from port to starboard; that the Pierce continued on at the same undiminished speed, and that although the Corozal swung to the left under a hard left rudder, the starboard side of the Pierce, about amidships, struck the Corozal's starboard bow.

The testimony of the Pierce's witnesses is that just before the collision her master was in the chart room immediately abaft of the wheel house; that the third mate Raulerson was on watch on the outside bridge; that the lookout Schwar was in his quarters aft having obtained leave from the mate to get his oil skins as it had started to rain, and that the standby man had not been summoned to take his place in his absence; that when the Corozal was first sighted she was bearing about three points on the starboard bow and at about nine hundred feet away; that although the course of the Corozal could not be definitely made out when first sighted, her bearing was observed to be increasing and the third officer concluded she was on a parallel and opposite course in a position to pass safely starboard to starboard, but as an added measure of precaution ordered 5 degrees left rudder. After she had steadied on that course, he ordered "more left". Upon hearing the third officer's order to the helmsman, the master came out on the bridge and after looking, blew two blasts to which the Corozal immediately replied with two blasts and both officers observed that the bearing of the Corozal was not increasing and that she seemed to be coming directly toward the bridge of the Daniel Pierce, and when they were twenty to twenty-five feet apart the Pierce's engines were put full speed astern, but the starboard bow of the Corozal struck the starboard side of the Daniel Pierce about one hundred feet from her bow.

Immediately after the collision the engines of both vessels were stopped and they drifted apart, and after some five or ten minutes, each proceeded on her course. At no time before the collision did either vessel turn on her lights. The angle of the collision between the starboard sides of the two vessels as they came in contact was variously estimated by the witnessees of the Pierce from twenty to forty-five degrees, and by the witnesses of the Corozal from twenty-nine to forty degrees.

As the Corozal was on a course 117 degrees true, and the Pierce was on a course 285 degrees true, it is apparent that they were on courses which diverged by 12 degrees—a little over a point, and were therefore on crossing, not on opposite parallel courses.

The Pierce urges that the collision occurred substantially west of the point where the original courses intersected and that the collision was caused by the Corozal turning to the right directly across the course of the Pierce. The Corozal contends that the collision occurred about at the point where the original courses intersected. Each endeavors to prove their respective conclusions by mathematical computation. But each adopts their own version of the testimony as to the bearings when the other vessel was sighted. If the testimony of the Corozal's watch officer and port bridge lookout that the Pierce bore from three-quarters to a point on the Corozal's port bow is accepted, then this contention of the Pierce is clearly wrong. If the testimony of the Pierce's watch officer that the Corozal's bearing was broadening is to be accepted, then Pierce's conclusion might be correct. However, I think there is no need to resort to mathematical speculations founded upon uncertain facts. There are sufficient positive facts upon which to determine the causes of the collision.

One of the main causes of the collision was the action of the Corozal in putting her rudder "hard right" upon sighting the Pierce without knowing the Pierce's course and without blowing any signal, with the result that she headed toward the Pierce instead of away from her.

After examining the deposition of Mac-Geachie, third officer of the Corozal, his testimony before the Marine Board, his entry in Corozal's log, and other circumstances, my conclusion is that upon sighting the Pierce he ordered "hard right rudder", but did not sound the one blast signal called for under Article 28 of the International Rules, 33 U.S.C.A. § 113, in a port to port passing. It further appears that his two blast signal was not sounded, nor the Corozal's wheel put hard left until he received the two blast signal from the Pierce and while the Corozal was under the impetus of the hard right rudder, and judging from the angle of collision the Corozal had substantially altered her course to starboard. Moreover, this change of course

was made before those in charge of her navigation ascertained the Pierce's course.

■ The Pierce was also at fault for violation of Article 28 in failing to sound promptly a two blast signal upon altering her course to port. When Raulerson, the watch officer on the Pierce's bridge, first sighted the Corozal about three points on the starboard bow about nine hundred feet away, he was uncertain of her heading as her outline was indistinct in the darkness, but thought she was running parallel with the Pierce in the opposite direction. He ordered a 5 degree left rudder; then after she had steadied on that course, he ordered "more left". However, it was not until the master, who had been lying down in the chart room, heard this order, came on the bridge and observed the Corozal, then estimated by him to be five hundred feet away, that the two blast signal was sounded. It was blown by him forty-five seconds, according to his estimate, after he heard the third officer's order "more left". Exactly how much time elapsed between the original change of course and the sounding of any signal, it is impossible to say, but enough time elapsed for the Pierce to have steadied on the 5 degree change of course plus the forty-five seconds interval between the "more left" order and the sounding of the signal. Such a delayed warning is not adequate notice of change of course and is not a compliance with the Rule. The Cushing, D.C., 266 F. 570, affirmed, 2 Cir., 292 F. 560.

In view of the position of the two vessels, Pierce's failure to immediately signal her change of course may well have been a contributory cause of the collision. But at least the Pierce has not shown that it could not have contributed to the collision as she must do to be excused under the rule of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148.

■ I think both the Pierce and the Corozal were seriously at fault in failing to switch on their lights when they sighted the other in the dark distance. All that those on either vessel could see was a dark dim object. Neither could make out the heading of the other; yet they continued on under full speed, attempting to maneuver with reference to the other vessel.

■ Counsel for the Pierce urge that the Corozal "misjudged the bearing" of the Pierce, and Pierce's watch officer testified that the course of the Corozal could not be definitely made out when first sighted, but he concluded that she was on a parallel and opposite course. Had the red and green lights been switched on promptly the navigators of the two vessels would have been warned of the position and course of the other vessel, and more than likely could have navigated so as to pass safely or reversed their engines and avoided a collision. No adequate reason, such for instance as the immediate danger from submarine, is given by either vessel for not switching on her lights. The watch officer of the Pierce did not think of it and her master testified that he understood that no lights were to be used at all; but he produced no order of the Navy to that effect. The third officer of the Corozal said that he did not turn on her lights because to do so he would have had to go inside and he would have lost sight of the other ship. This latter reason is not a valid excuse, for her running lights should have been so located that they could be turned on immediately if necessary to avoid collision. Indemnity Mutual Marine Assur. Co. v. United States, 1931 A.M.C. 1987.

■ When confronted with a situation of special circumstance, such as the imminent danger of collision, it is the duty of a vessel, even when proceeding without lights pursuant to orders of the Navy, to promptly turn on her running lights to warn the other vessel of her position and heading. The Cushing, D.C., 266 F. 570, affirmed 2 Cir., 292 F. 560; Indemnity Mutual Marine Assur. Co. v. United States, 1931 A.M.C. 1987. The authorities in England are to the same effect. The Dominion Monarch, 71 Lloyd's List L.R. 110, on appeal, 73 Lloyd's List L.R. 229; The Jernland, 71 Lloyd's List L.R. 151; The Testbank, 70 Lloyd's List L.R. 270, on appeal Lloyd's List L.R. 6 [1942].

■ The Pierce was negligent in failing to have any lookout at the time. Previous to the collision the third officer, the wheelsman and her one lookout were on the bridge of the Pierce, but shortly before the Corozal was sighted the lookout had been given permission by the officer to go to his quarters for his oil skins. No one was called to relieve him, and he was in his quarters putting on his oil skins when the Corozal was sighted by the third officer looking through a small slit in the wheelhouse window. A deck officer in charge of the navigation of the vessel is not a proper lookout. The Ottawa, 3 Wall.

268, 18 L.Ed. 165. Proper lookouts are persons other than officers of the deck or the wheelsman. The Arthur M. Palmer, D.C., 115 F. 417. "The want of a competent lookout properly stationed and vigilant is a fault in a vessel as a result of which she assumes the consequential risk of a collision to which the fault contributed." The Buenos Aires, 2 Cir., 5 F.2d 425, 432, and the burden is on that vessel to show that this fault was not a contributing cause. The Ariadne, 13 Wall. 475, 20 L.Ed. 542; The Madison, 2 Cir., 250 F. 850; The Pilot Boy, 4 Cir., 115 F. 873.

The master of the Pierce admitted that ordinarily she had a lookout on the forecastle head except when the sea was too rough, which it was not on this night.

Counsel for Pierce urges that the absence of a lookout was immaterial as the third officer sighted the Corozal as soon as it was possible for anyone to see her and that the sole cause of the collision was the Corozal's change of course. Whether a lookout would have sighted the Corozal sooner is speculative; but Schmidt. Pierce's engineer who was on deck getting some fresh air—not on watch—said that he saw the Corozal when about two thousand feet away. Had the officer in charge of Pierce's navigation been informed earlier of the approaching Corozal, he would have had more time to meet the situation; at least, it would have tended to avoid his confusion and haste when he saw her only nine hundred feet away.

The Corozal had two lookouts—one on each wing of the bridge, but none in the bow. The failure to have a lookout in the forward part of the vessel is inexcusable when, as here, she was proceeding "blacked out", at full speed in misty weather, and the safety of other vessels, as well as her own, depended largely upon the vigilance of proper lookouts. Several excuses were given for not having such a lookout, but these fail to justify a departure from this requirement insisted upon by Judge Addison Brown in the Patria, D.C., 92 F. 411. See also New England Maritime Co. v. United States, D.C., 55 F.2d 674, affirmed United States v. Gould, 1 Cir., 73 F.2d 1016; Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603, 605; Watts v. United States, D.C., 123 F. 105.

In The Vedamore, 4 Cir., 137 F. 844, it was held that a lookout should be placed in the bow of a ship; that this is the best position to hear and observe and that it will not avail a ship, which is bound to properly place her lookout, to show that its deck was so crowded that proper room could not be reserved for stationing a lookout.

The above findings of fault are sufficient to account for the collision, and it seems unnecessary to further consider the charges made by each vessel that the other was at fault for failing to stop and reverse her engines until in the jaws of the collision.

Both vessels were guilty of faults which resulted in the collision. It is a case of divided damages. A decree may be entered accordingly with a reference to a Commissioner as to the amount of damages. Proposed findings of fact and conclusions of law may be presented on ten days' notice.