948

## THE MADIANA.

## THE CHAGRES.

## SHAW v. NORTH ATLANTIC TRANSPORT CO. Inc., et al.

## ST. LAWRENCE CORPORATION OF NEW-FOUNDLAND, Limited, et al. v. UNITED STATES LINES CO.

District Court, S. D. New York.

July 21, 1944.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin and Charles S. Haight, Jr., both of New York City, of counsel), for George T. Shaw.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and John F. Gerity, both of New York City, of counsel), for the Chagres and United States Lines Co.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagen, Jr., of New York City, of counsel), for cargo.

GODDARD, District Judge.

In Admiralty.

These two libels and the cross libel were filed for damages sustained in a collision between the barkentine Madiana and the Steamship Chagres. Shaw, the owner of the Madiana, seeks damages sustained through her sinking. The libel of the St. Lawrence Corporation and other parties interested in the Madiana's cargo is filed against the Chagres and the United States Lines Company, her demised owner, for loss of her cargo. United States Lines Company filed the cross libel against Shaw

for damages to the Chagres. Shaw, in the answering cross libel, sets up as a separate defense the statutory right to limit liability, if any, alleging that the Madiana was a total loss and that there was no pending freight.

The collision occurred off the coast of Newfoundland on July 4, 1942 at about 3:45 a.m. Chagres time, and at about 3:30 a.m. Madiana time. At the time of the collision and for about twelve hours previously there was a dense fog, which reduced visibility of unlighted objects to a distance variously estimated from two hundred to four hundred feet, though lights might be seen a little further.

The Chagres, 427 feet overall, left Sydney, Nova Scotia, on the morning of July 3rd in a convoy of some forty ships with cargoes bound for the United Kingdom, escorted by two destroyers and several corvettes, as a protection from enemy submarines. The convoy was made up of nine columns, and the Chagres was assigned position No. 92—the second vessel in the ninth or starboard column. Ahead of her was the Tovelil and No. 93, astern of the Chagres, was a Greek steamship, the last ship in that column.

Before leaving Sydney, the master of each ship in the convoy received instructions from the naval routing authorities and from then on the convoy proceeded under these instructions and the orders of the Commodore of the convoy. The convoy rules and regulations called for a space of five cables [3000 feet] between each of the columns of the convoy and a space of three cables [1800 feet] between ships in the same column. The space covered from the port to the starboard column was about four miles. The Chagres was proceeding under convoy orders "blacked out" at a convoy speed of seven knots on the convoy course of 94° true or about S E x E Magnetic. She was trailing a fog buoy on a thousand foot line as a warning to the vessel astern of her. The convoy rules and regulations also provided for a special system of convoy fog signals at each quarter hour. The Commodore's vessel, the leader of the middle column, would sound on her whistle the code signal representing her No. 51; then the column leaders to the port and starboard of the Commodore would, in rotation, blow their respective numbers, after which certain ships astern specifically designated as "repeaters" would blow their respective numbers. These code signals consisted of five blasts in combinations of "short" and "long."

The Madiana, a three masted barkentine two hundred feet overall, without auxiliary power, sailed from St. Lawrence, Newfoundland, on June 27, 1942, for Sydney, Nova Scotia, with a cargo of 482 tons of fluorspar. She had been overhauled in March and April of that year and was then classed in Bureau Veritas, at which time she was inspected by the Bureau Veritas surveyor and by the Canadian Government Inspectors. She carried a crew of eight. Her captain was not licensed, but had some thirty years experience at sea and had been master for about seven years on various types of sailing vessels in the North Atlantic and Newfoundland waters. She was equipped with a mechanical foghorn which was permanently attached to a block on the quarter deck, forward of the mizzen and was on a swivel so that its funnel could be pointed in any direction. According to Madiana's witnesses, it was a French horn, which could be heard more than a mile in foggy weather, and was more powerful than those ordinarily used on fishing vessels.

At sunset on July 3rd her regular port and starboard lights were lighted, and she was on a course W x S, which carried her across the path of the convoy, and making about two knots; the heavy fog came in about 6 p.m. and lasted until after the collision and her foghorn was sounded at frequent intervals from then on. At 3:10, estimated Madiana's time, shortly after her captain had come on deck, a number of whistles were heard and he realized that the signals were those of a convoy. He called the men who were below deck, hoisted a white light, and increased the frequency of blasts on the foghorn. A ship was seen to pass astern on the Madiana's starboard quarter; the fog whistles of another ship were heard on the Madiana's starboard bow and shortly afterwards the Chagres appeared out of the fog about two and one-half points on the Madiana's starboard bow at a distance variously estimated by members of the Madiana's crew as from 60 to 450 feet. Soon after the stem of the Chagres drove into the starboard side of the Madiana about amidships. After the collision the Chagres kept her bow in the wound in the side of the Madiana until the crew of the Madiana

came alongside in their boats and were taken on board, when the Chagres backed clear and the Madiana sank with her cargo.

The testimony of the Chagres is that shortly after the completion of the exchange of the quarter hour convoy signals, and shortly after she had blown her whistle to indicate her position to the vessel astern in her column, the lookout on her forecastle head reported to the bridge that he heard a foghorn on the port bow which also had been heard by those on the bridge; that the captain threw the engine room telegraph to "stop"; that a few seconds later the lights of the Madiana appeared ahead at a distance variously estimated to be from two to four hundred feet and wheel was ordered hard left and the telegraph was put "full astern."

According to the testimony of the captain, the collision occurred thirty seconds after the "full astern" order; the testimony of the first officer is that the collision occurred about twenty seconds after the hearing of the foghorn, and that of the lookout is that it occurred ten seconds after he saw the Madiana's lights.

The Madiana charges the Chagres with proceeding with excessive speed, with maintaining an insufficient lookout, resulting in her failure to hear the Madiana foghorn sooner, and with failing to stop her engines and to navigate with caution the instant that she heard the foghorn as required by Article 16 of the International Rules, 33 U.S.C.A. § 92.

The Chagres alleges that she was governed by, and was proceeding under convoy regulations and instructions; that the Madiana failed to give timely warning of her presence; that it does not appear that the Chagres could or should have heard the Madiana's foghorn any sooner than she did, and that she took prompt action to avoid collision as soon as the horn was heard; that those in charge of the Madiana were incompetent, and that she was not properly equipped; that the Chagres was not guilty of any negligence and should be fully exonerated.

■ Although the Madiana and those interested in her cargo criticize the Chagres for proceeding at seven knots blacked out in a dense fog with a visibility of half a ship's length and not blowing the regulation fog signals, she is not to be condemned for this, for she, as a member of a wartime convoy, was but complying with the instructions of the convoy's Commodore, who was a duly authorized officer acting under orders promulgated and issued by the Secretary of the United States Navy and the Commandant of the United States Coast Guard. Under First War Powers Act of 1941, § 1, 50 U.S.C.A.Appendix, § 601, the Second War Powers Act of 1942, § 501, 50 U.S.C.A.Appendix, § 635, and Executive Order 9083, 50 U.S.C.A.Appendix, § 601 note, 7 Fed.Reg. 1609, Congress specifically authorized the Waiver of Navigation and Inspection Laws by a responsible department or agency head, for the conduct of the War. By Executive Order 9083, 7 Fed.Reg. 1609, the Secretary of the Navy was vested with this authority and pursuant thereto issued an order waiving compliance with certain navigation laws, so that vessels might comply with instructions and orders "issued by a United States routing officer, Commander of a sea frontier, or other competent naval authority of the United States or any of the United Nations". The United States Coast Guard acting under this authority and by virtue of its control over merchant vessels, issued its instructions in conformity with the order of the Secretary of the Navy and prescribed severe penalties for the failure to comply with routing instructions issued by proper authority. Similar wartime provisions had been exacted previously by the Government of Great Britain in the Emergency Power Defense Act of 1939, Sections 1 and 43.

The convoy system was adopted by our Government as a necessary protection for allied vessels against enemy attacks, which were seriously threatening our shipping of troops and materials of war. That the vessels in a convoy should navigate in accordance with the wartime regulations and orders of those in charge of such operations was imperative. These authorized orders and regulations are generally recognized as having the force of law both in this country and in England. Queen Ins Co. of America v. Globe & Rutgers Ins. Co. (The Napoli), 263 U.S. 487, 44 S.Ct. 175, 68 L. Ed. 402; The Vernon City, 70 Ll.L.Rep. 279, affirmed 72 Ll.L.Rep. 223; The Chester Sun v. The Neva, 1 Ll.L.Rep. 478; The Ben Hann, 75 Ll.L.Rep. 187; The Britain S.S. Co. Ltd., 1 A.C. 99.

■ Insofar as such orders and instructions override peacetime existing law,

the wartime orders and regulations are paramount and the Chagres was bound to obey them. But the Chagres was bound to observe such of the International Rules as were not affected by her convoy orders and instructions. She was not excused if unseaworthy, if she failed to maintain an adequate or efficient lookout, nor if she failed to exercise reasonable care commensurate with the extra hazards for the safety of other vessels.

Article 15(c) of the International Rules, 33 U.S.C.A. § 91(c), requires that a sailing vessel under way in a fog shall sound a fog signal at intervals of one minute. According to the statement in the captain's protest signed by the mate and some members of the crew, the Madiana's horn was blown all night at two minute intervals down to the "point and time of collision." The testimony of the captain at the trial was that fifteen minutes before the collision he gave orders to blow the horn more often and from then on it was blown at intervals of thirty seconds. The mate testified that he had been sounding the horn for ten minutes and then turned it over to the cook; that during the first five minutes he, the mate, had sounded it at intervals of one minute to one minute and a half and then at shorter intervals; that the cook, a seaman of long years experience on the Grand Banks, continued to sound it. The cook testified that he took over the horn from the mate and continued to sound the horn, but had had time to blow but two sharp short blasts followed a few seconds later by a prolonged blast, when the Chagres loomed out of the fog. Other members of the crew testified to sounding the horn all during the night at intervals of one and one-half minutes to two minutes.

■ In view of this positive testimony the only conclusion justified is that during the night her foghorn was sounded at intervals of one and one-half to two minutes and that at least for upwards of five minutes before the collision, it was sounded at intervals of not more than one minute, and for the previous five minutes—at intervals of not more than one and one-half minutes. It does appear, as suggested by proctors for the Chagres, that those on board the Madiana were alarmed when they realized that she was in the midst of a convoy in a dense fog and that there may have been some excitement in getting the boats ready. But it seems to me, there is a strong probability that in the face of grave danger of being run into, these Nova Scotia mariners would not fail to make energetic use of the horn. The Chagres urges that if it was being sounded, no horn was heard by the Chagres until less than one minute before the collision, either because the horn was faint or the sounding of whistles by the vessels in the convoy made it inaudible. In contradiction of this contention made by the Chagres is the disinterested testimony of the master and of the second mate of the Tovelil, the vessel ahead of the Chagres. The master of the Tovelil estimated that he first heard the Madiana's horn when she was four or five cables [2400–3000 feet] distant; the mate estimated the distance about half a nautical mile [3000 feet], and testified that he heard the Madiana's horn three or four times before the Tovelil passed the Madiana, and each said he continued to hear it at very short intervals until just shortly before the crash of the collision was heard. The average of the various reliable estimates of the distance between the Tovelil and Madiana as they passed is about 300 feet. As the Chagres was within 1800 feet of the Tovelil at the time the Tovelil was passing the Madiana, the Chagres was within range of the Madiana's horn and from then on, as she was diminishing the distance between her and the Madiana at the rate of 700 feet a minute, the lookout on the Chagres, if alert, should certainly have heard the horn, for it was being sounded at very short intervals up to the time those on the Tovelil heard the crash. The light south wind would have had practically no effect on the sound of the horn.

In reference to the contention that the whistles of the vessels in the convoy prevented the Chagres from hearing the Madiana's foghorn—The captain of the Chagres estimated that eight to ten minutes was required to complete the quarter-hour exchange of convoy fog signals; the captain and the mate of the Tovelil estimated three to five minutes. Accepting an average of their estimates as five and one-half to seven and one-half minutes, the exchange of signals would have been completed seven and one-half to nine and one-half minutes before the collision. During this period the Chagres blew one blast to the ship astern of her and another one blast just before the collision. These two signals of one blast each could not have

drowned out the blasts of the Madiana's horn during that period.

The suggestions that the sound of the horn was deflected by the fog or that the horn was faint is met by the fact that those on the Tovelil heard it. It is impossible to escape the conclusion that the failure of the Chagres to hear it sooner was due to her inexperienced and inadequate lookouts. Cf. The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126. Stationed on the forecastle head of the Chagres as lookout was a young man of twenty-one years who had never served on deck before this voyage, his previous experience at sea being limited to eight months service in the cabin department some two years before. Due to his lack of experience he would not be as likely as an experienced man to readily distinguish foghorns and whistles and to understand their significance. He neither heard nor reported the horn until it had been heard on the bridge and by the helmsman in the enclosed wheel house. There had been an experienced A.B. stationed on the bridge as lookout but before the collision he had gone aft to call the next watch. There was no one aloft in the crows nest. The captain, who had been on duty without sleep for eighteen hours, was in the wheel house; the second officer was on the open bridge. Proceeding blacked out at seven knots in a dense fog through frequented waters increased the danger of collision and reduced the normal means of avoiding it.

Under such circumstances prudence requires that a ship should be more alert than usual and that the number of lookouts employed under normal conditions be increased. There is a strong probability that if the Chagres had stationed a lookout aloft, or another lookout on deck, as I think she should have, the presence of the Madiana would have been discovered in time to have avoided a serious collision. Cf. The Sagamore, 1 Cir., 247 F. 743; The Colorado, 91 U.S. 692, 23 L.Ed. 379; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L. Ed. 943; The Paris, D.C., 37 F.2d 734, affirmed 2 Cir., 44 F.2d 1018.

It is said that the Chagres was negligent also in failing to stop her engines and to navigate with caution the instant she heard the foghorn of the Madiana forward of her beam, in violation of the second sentence of Article 16 of the International Rules. Compliance with this Rule is imperative. Lie v. San Francisco, etc. S.S. Co., 243 U.S. 291, 37 S.Ct. 270, 61 L. Ed. 726, and a ship which violates it has the burden of proving that her violation could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. Proctors for the Chagres urge that if the first sentence of Article 16 with respect to speed has been superseded by convoy orders, it is logical to assume that the second sentence of the Article has also been superseded for the two are co-related. The second sentence of the Article reads:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, *so far as the circumstances of the case admit,* stop her engines, and then navigate with caution until the danger of collision is over." [Emphasis mine.]

Convoy orders expressly authorized a convoy vessel to proceed at greater speed than the "moderate" speed to which a vessel in a fog was ordinarily limited. However, I do not think that a convoy vessel was excused from complying with the second sentence, but full effect must be given to the words "so far as the circumstances of the case admit." Whether or not a vessel in a convoy should stop her engines upon hearing forward of her beam the fog signal of another vessel, is a question of fact depending upon the circumstances of the particular case.

In The Vernon City, 70 Ll.L.Rep. 279, affirmed 72 Ll.L.Rep. 233, Mr. Justice Langton at p. 291, referring to a collision in a fog between The Vernon City in a convoy and the Lairdscastle, an independent vessel, said:

"There was no convoy order to the effect that she [The Vernon City] was not to stop upon hearing a whistle forward of her beam, and she is also open to criticism in not having stopped her engines at the moment when she first sighted the masthead light of the Lairdscastle. These are matters which fall to be decided in relation to the particular circumstances of each individual case. It is certainly not my desire, nor my intention, to lay down any principle by which vessels in convoy could be said to be excused from any obligation under the Sea Rules which they could properly fulfill. Convoy or no convoy, if a vessel navigating in fog could stop her en-

gines without danger to the other vessels in the convoy upon hearing a whistle forward of her beam * * * I should require strong evidence of special circumstances or special dangers to exonerate her from non-observance of her duty under the Rules."

The Vernon City was exonerated from failing to stop her engines upon hearing a whistle forward of her beam and not having stopped her engines the moment she first sighted the masthead light of the Lairdscastle, because as the leading vessel in her line there was imminent risk of collision with the vessels following her and in neighboring columns.

But The Vernon City was part of a convoy that was proceeding through narrow waters, was the leading ship in her column with columns of ships on each side of her, the distance between columns being 1800 feet and between ships of the line 1200 feet. In the case at bar the Chagres was next to the last ship in an outside column and the columns were 3000 feet apart with a distance of 1800 feet between the ships in line, and she was trailing a fog buoy on a 1000 foot line as a warning to the ship astern of her.

There was no suggestion by the master of the Chagres that he refrained from acting sooner because of possible danger to other ships in the convoy. If the master of the Chagres had believed that his reversing and swinging to port would endanger the ship astern, he could have warned that ship by sounding a reversing signal of three whistles.

If the fog signals which the Madiana was sounding at frequent intervals had been promptly observed and reported, and the master of the Chagres had taken the action he eventually did when informed of the presence of the Madiana—reversing her engines and swinging to port—the collision would have been averted. The master of the Chagres said that in twenty or thirty seconds more she would have been "out of the line" of the Madiana, and her mate testified that in less than a minute more the Madiana would have passed, and it is apparent that in a few seconds the Madiana would have run the 100 feet necessary to pass clear; also that with the Chagres swinging to port the distance which the Madiana had to go to pass clear would have been lessened.

The evidence does not disclose any contributing fault on the part of the Madiana. She had the right—an equal legal right—to sail the high seas. For obvious reasons she was not warned that there was a large convoy leaving Sydney. When she found herself in the midst of the convoy in a dense fog and light wind, there was little she could do except keep her foghorn going, which I find she did. It is urged that she should have fired a gun or sent up rockets, but firing a gun might well have caused the escorting warships to believe that she was attacking the convoy and to fire upon her. A rocket would have been of little service in the fog. Moreover, she could reasonably believe that her horn would be heard by all the ships in her vicinity.

I think that the collision was entirely due to the failure of the Chagres to maintain an adequate and efficient lookout with the result that she did not take prompt action to avoid running into the Madiana.

George T. Shaw, the owner of the Madiana, and the St. Lawrence Corporation of Newfoundland, Limited, et al., as owners, etc., of cargo, may have a decree with the usual reference to a Commissioner to ascertain the amount of damages. And the cross-libel against Shaw is dismissed. Proposed findings of fact and conclusions of law in accordance with the above may be submitted on ten days notice.