**THE LILLIAN E. KERR et al.**

**THE ALCOA PILOT.**

**THE RITA et al.**

**THE CYRUS FIELD et al.**

**ALCOA S. S. CO., Inc., v. PUBLICOVER et al.**

District Court, S. D. New York.
March 31, 1947.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark, Charles E. Wythe, and C. B. Manley O'-Kelley, all of New York City, of counsel), for the Lillian E. Kerr, cargo and loss of life claimants.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and John F. Gerity, both of New York City, of counsel), for the Alcoa Pilot.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin, James McKnown, Jr., and MacDonald Deming, all of New York City, of counsel), for the Rita and the Royal Norwegian Government.

Bigham, Englar, Jones & Houston, of New York City (Richard F. Shaw and Julian S. Gravely, Jr., both of New York City, of counsel), for Western Union Telegraph Co., claimant of the Cyrus Field.

GODDARD, District Judge.

This suit is brought by James L. Publicover, the Managing Owner of the four-masted schooner Lillian E. Kerr, and as representative of the co-owners of the schooner, and as bailee of cargo, and by the personal representatives of her master, officers and crew, to recover damages sustained as a result of collision between the Lillian E. Kerr and the steamship Alcoa

Pilot on the early morning of November 13, 1942, in the vicinity of Longitude 68° 26' West, Latitude 42° 26' North, approximately 75 miles northeast of Cape Cod, in which the Lillian E. Kerr was sunk with her cargo and the lives of her master and the entire crew were lost, together with their personal effects.

The original libel was filed by James L. Publicover against the Alcoa Pilot. The owners of the Alcoa Pilot impleaded the steamship Rita and the cable ship Cyrus Field, owned by the Western Union Telegraph Company. Alcoa Pilot's owner, the Alcoa Steamship Company, Inc., also filed a cross libel against Publicover and a libel against the Cyrus Field.

The libel of the James L. Publicover charges that the collision was caused solely by the negligence of the Alcoa Pilot and that, those in command of her failed to render assistance in saving the crew of the Kerr after the collision. The cross libel of the Alcoa Pilot alleges that the collision was not caused by any negligence on her part, but was due to the negligence of the Lillian E. Kerr, the Cyrus Field, and those in charge of the escorting corvettes; also that those in command of the Cyrus Field and the Rita, impleaded by the Alcoa Steamship Company, Inc., failed to render prompt and proper assistance in rescuing the schooner's crew.

Counsel for the Alcoa Pilot does not admit that the vessel which was sunk in the collision was the schooner Lillian E. Kerr. Although all of her crew went down with the ship with the exception of the second mate who was picked up about an hour after the collision and died soon after, the circumstantial evidence when pieced together, leaves no reasonable doubt as to her identity and that she was the Lillian E. Kerr.

On November 12, 1942, shortly before midnight, the Kerr, bound from New York to Halifax, Novia Scotia, with a cargo of coal, was in the vicinity of Longitude 68° 21' West, Latitude 42° 26' North. The Kerr had all sails set but the wind was light, hardly enough to give her headway; her regulation running lights were lit; it was dark, no moon, and partly overcast.

The Alcoa Pilot in a convoy bound from Halifax to New York was proceeding without lights, as were all of the ships in the convoy, on a westerly course at a convoy speed of 6½ to 7 knots. The convoy consisted of eight ships and was made up of four columns, with two ships in each column and escorted by three—possibly four—Canadian corvettes. The distance between columns was three cables [a cable being 600 feet]; the distance between ships in each column was two cables. The Alcoa Pilot was the leading ship in the port column. Astern of her in the same column was the Rita; to the starboard of the Alcoa Pilot was the Cyrus Field, the leading vessel in the second column. Captain Delap, her master, had been delegated by the Naval authorities as the convoy's Commodore.

Around midnight those in charge of the Alcoa's navigation observed a white light about two points on her port bow. Her watch officer testified that the white light seemed to remain in about the same position or to close in a little; that after observing the light for fifteen to nineteen minutes, it then disappeared and a green light was seen on about the same bearing. Upon seeing the green light the watch officer left the upper bridge and ran below to the "light panel" in the wheelhouse and threw on the red and green side lights. Before he arrived back on the bridge he saw the loom of a schooner's sails between the bridges. By the time the watch officer returned to the bridge, the schooner was close and he ordered the rudder hard right; then it was too late. He did not reduce speed until after the collision.

About two minutes after those on the Alcoa Pilot first observed the green light the port bow of the Alcoa Pilot struck the starboard side of the schooner near the fore rigging. The schooner slid along the Alcoa Pilot's port side and astern of the Alcoa Pilot and sank in some five minutes. The Alcoa Pilot continued on for two minutes after the collision and then stopped her engines; about four minutes later she resumed her convoy course.

The watch officer of the Alcoa Pilot testified that he thought the white light might be a light on one of the escort vessels or

that if it was a light on an outside vessel it would be seen and dealt with by the escorts, and that he should await orders from the Commodore before altering her course or speed. However, he did, without orders from the Commodore, alter her course from 275° to 278° to get back to the convoy course and a few minutes later to 280° "to give more room to the light." It was getting closer. Later, when danger of collision was or should have been apparent, he held to his course and speed until too late to avoid collision.

 Eight or ten minutes before the collision the Cyrus Field, 1200—1800 feet to the right of the Alcoa Pilot, altered her course ten degrees to the right to give the Alcoa Pilot more room to avoid possible collision with the vessel showing the white light. Eventually when the schooner was about 100 feet away, the Alcoa Pilot did alter her course four to six points under a hard right rudder. Then it was too late as the swing did not get under full way until after the collision. Had the Alcoa Pilot taken similar action earlier, the collision would in all probability have been avoided, as the schooner was either becalmed or moving slowly and was struck in her forward rigging. The Benalla, D.C., 45 F.2d 864. Moreover, when the watch officer on the Alcoa Pilot did see the green light approximately two minutes before the collision and the danger of collision should have been apparent, instead of stopping and reversing her engines, he ran below to turn on her red and green side lights and left the bridge with no officer in command, and although the wheelsman realized as soon as the officer had left the bridge that there was danger of collision and that immediate action should be taken, he had to wait until the officer returned. The lookout stationed on the port wing of the bridge having observed the loom of the sails immediately after seeing the green light attempted to report it to the watch officer whom he could not locate upwards of half a minute as he had gone below. During the entire period after the green light was observed, the ship continued on at the same speed, travelling some 1300 feet to the point of collision. [Speed 6½—7 knots, 650 feet a minute for two minutes.] In answer to the question "Was it the observation of a green light which made you conclude that there was danger?" Shoberg, the watch officer, testified: "Well, I judged there would be danger, being they show the green light, it is coming head on, it would be danger, but there wasn't immediate danger yet when I saw the green light, because as long as I didn't see the outline of the ship I judged that there was room to turn for that ship, and that is the reason I went down to put the lights on, to show my lights that the other ship could act." Merely turning on her lights without using her helm or engines served only to warn the schooner of the presence of the Alcoa Pilot and to place the burden of avoiding collision entirely upon the schooner. This was inexcusable. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126. The failure of the Alcoa Pilot to see the schooner sooner is unexplained. Shoberg, her watch officer, testified that an unlighted vessel could be seen at about one half mile and he could see the Cyrus Field on his right; also the vessel astern of him. Although the visibility to west [to the port of the Alcoa Pilot] was less because of overhanging clouds, the watch on the Cyrus Field saw the loom of the sails and green light before the collision 1200–1800 feet further away. The Alcoa Pilot's watch officer is subject to criticism for leaving the bridge with no one to give orders in the face of immediate danger. The Corozal, D.C., 62 F.Supp. 123, 126-127.

 The Alcoa Pilot urges that the failure of the watch officer to promptly make use of her helm and engines was but an error of judgment in any event. But a failure to take the necessary and timely action which a reasonably careful mariner, reasonably skilled in his occupation would have under the circumstances, is more than an error of judgment; it is negligence. The Eli B. Conine, 2 Cir., 233 F. 987; Theory and Charlotte, Lloyds List Law Reports, Vol. 2, p. 570.

It is argued in behalf of the Alcoa Pilot that she could not alter her speed or course without danger of collision with other ships in the convoy, but she could have warned the ship astern by a three whistle

reversing signal, and the Cyrus Field on her right had altered her course 10° to the right to give the Alcoa Pilot more room to avoid possible collision with the vessel showing the white light. Moreover, the Alcoa Pilot did swing to the right, but too late, and she did stop her engines but not until some minutes after she had struck the schooner.

 The Congress had authorized the waiver of compliance with the Navigation Laws upon request of the Secretary of the Navy to such extent and manner as he finds necessary in the conduct of the war, and the Secretary of the Navy had issued an order waiving compliance to the extent necessary to permit conformity with orders of the Routing Officer or other Naval authority; and the Routing Officers and Naval authorities issued various orders and instructions. Insofar as such orders and instructions override peacetime existing laws, the wartime orders and regulations are paramount and the Alcoa Pilot was bound to obey them. The Madiana, D.C., 63 F.Supp. 948. But there were no instructions or orders which prohibited a ship in convoy from taking necessary and prompt action when confronted with immediate danger of collision with another ship. Under such circumstances there was no waiver of the duty to adopt every reasonable measure to avert a collision so far as practical and with regard for other ships in the convoy. The Corozal, D.C., 62 F.Supp. 123, 126, 127.

The Convoy routing orders and instructions ["Mersigs" Navy Ex. 1] provide that:

"The Master is responsible for the safe navigation of his ship * * *." p. 3,

And

"If you are forced out of position by another ship to avoid collision, you may have to use full rudder and increase or decrease speed * * *." p. 5.

Although certain restrictions were placed upon the ships in the convoy, the Alcoa Pilot does not contend that she could never change course or speed, but urges that she was obliged to maintain her convoy position by holding course and speed [within 3° of the convoy course] until she had notice of

some immediate emergency which necessitated individual action on her part. This is not disputed. But when confronted with an immediate emergency, she was not only free to act but it was her duty to take prompt and proper action. That he knew he did not have to await orders from anyone is admitted by the Alcoa Pilot's watch officer himself:

"Q. * * * When you realized the situation of danger, you could have taken any of these steps independently without orders from anybody, couldn't you? A. That is right, when I figured there was danger, which I did."

 It is clear that the reason her watch officer did not make prompt use of her helm and engines was not because he did not receive any order from the Commodore, but because he failed to recognize the situation as one of imminent danger of collision.

There is no proof of fault on the part of the Lillian E. Kerr. The schooner had no auxiliary power; her side lights were lit, and she was either becalmed or limited in her maneuvers by a light wind. A notice to mariners recommended that single vessels keep clear of convoys, but the routing of convoys was for obvious reasons a secret and they were blacked out to conceal their presence.

It is urged in behalf of the Alcoa Pilot that her watch officer was entitled to rely upon the escorts investigating the white light, and if it was not on one of them to be warned by them or the Commodore on the Cyrus Field if the light was on a vessel whose course threatened danger. Whether the escorts observed the lights does not appear; possibly none was in range at the particular time or may be it was assumed that the ships in the convoy would watch the lights and take necessary action if there was danger of collision, for it was the duty of a ship to take independent action if threatened with danger of collision. The Alcoa Pilot was in a much better position to observe the white and green lights than the Cyrus Field which was 1200–1800 feet further away. In any event the proximate cause of the collision was the failure of the Alcoa Pilot to take prompt and proper action upon observing the white and then the

green lights. The Benalla, D.C., 45 F.2d 864.

The Kerr also charges the Alcoa Pilot with negligence for failing to render prompt assistance to the survivors.

The Stand-by Act [33 U.S.C.A. § 367] provides that after a collision it shall be the duty of the master or those in charge of each vessel, insofar as he can do so without serious danger to his own vessel, to stay by the other vessel and to render such assistance as may be practical and necessary, and if he fails to do so without reasonable cause the collision shall be deemed to have been caused by his wrongful act or neglect. But since I have found that the collision was due to the fault of the Alcoa Pilot and that she is liable for the resulting damage, there is no need for giving consideration to this presumption. Boston Towboat Co. v. Winslow, 1 Cir., 76 F. 595, 599; The Williamsport, D.C., 167 F. 184, 191.

 The petition of the Alcoa Pilot Steamship Company, Inc., impleads the Rita and charges her with failure to act as a rescue ship for the Kerr and her crew. The series of regulations for the conduct of convoys issued by the Naval authorities provide that the rear ships, unless they receive orders to the contrary, are to act as rescue ships and are to proceed to the assistance of any vessel in their respective column which may be damaged by normal marine risk, such as a collision or man overboard.* The duty of the rear vessel is specifically confined to the assistance of vessels forming a part of its own column. The Alcoa Pilot herself was not in need of assistance. The Rita had not been in collision with the Kerr. The Stand-by Act did not apply to the Rita; she was under no legal obligation to attempt to rescue any survivors of the Kerr's crew. It does not appear that any neglect of any legal duty on the part of the Rita was the cause of the death of a member of the Kerr's crew. Even if the master of the Rita failed in his duty to rescue any survivors of the Kerr, his breach of duty does not impose liability on the shipowner. Warshauer v. Lloyd Sabaudo, S.A. (The Conte Biancamano), 2 Cir., 71 F.2d 146, certiorari denied 293 U.S. 610, 55 S.Ct. 140, 79 L.Ed. 700. Moreover, the testimony of those on the Rita is that they did not see the collision, received no signal from the Alcoa Pilot, and did not know a collision had occurred until their arrival at the Cape Cod Canal. They did hear shouts off on her starboard side some 300 feet away, but thought that there had been a torpedoing somewhere ahead and the shouts came from survivors adrift in a lifeboat or on a raft; that submarines might be nearby, and that pursuant to convoy orders they should hold to their station and not get separated from the convoy.

 The libel of the Alcoa Pilot which is in rem impleading the Cyrus Field charges her with negligence in that her master, as Commodore of the convoy, failed to make prompt and proper investigation of the white light when it was first seen and failure to issue prompt and proper orders for change of convoy course and speed. Captain Delap was serving in a dual capacity—Master of the Cyrus Field by appointment of her owner, and Commodore of the convoy by designation of the Naval authorities. Although the Cyrus Field is responsible for Captain Delap's acts in his capacity as Master, the ship may not be held liable for his failure, if any, in the performance of his duties as Commodore; that is the responsibility of the authority which appointed him Commodore.

The faults charged relate to his duties as Commodore; as Master he neither had the duty nor the authority to issue orders to the Masters of other ships to change course or speed. The Cyrus Field had committed no marine tort, and is not liable in rem. The W. L. Steed, 2 Cir., 79 F.2d 2; The Edward G. Murray, 2 Cir., 278 F. 895.

---

* Mersigs Article 67 (a) (b).

"(a) Unless special vessels are available for the purpose, the rear ships of column are to act as rescue ships should the necessity arise.

"(b) Throughout the voyage rescue ships, unless they receive orders to the contrary, are to proceed to the assistance of any vessel in their respective columns which may be damaged by normal marine risk, such as collision or man overboard. They are not; however, to stop in order to save life from ships damaged by enemy action, unless a Local Escort is in company with the convoy or it can be done without undue risk."

190

As to the alleged failure of the Commodore to investigate the light and issue orders for a change of convoy course and speed, the Alcoa Pilot was 1200–1800 feet nearer the lights than the Cyrus Field and was in better position to determine whether the vessel with the light was likely to cross her course. The Alcoa Pilot made no attempt to communicate with the Commodore before the collision. Twelve minutes after it had occurred a message was sent by her informing him that a schooner had been picked up. Upon receiving this message the Commodore signalled to the senior officer of the escort and turned back to the vicinity of the collision and picked up the only survivor to be found.

The libelant, James L. Publicover, as Managing Owner of the Lillian E. Kerr, and on behalf of others for whom he sues, and the libelants administrators of the deceased members of the crew may have a decree with the usual reference to a Commissioner as to amount of damages.

The petition of the Alcoa Steamship Company, Inc., to implead the Cyrus Field and the Rita is dismissed; also the cross libel against James L. Publicover and the libel against the Cyrus Field is dismissed.

Testimony as to the provisions contained in "Mersigs" [Merchant Signals], a series of regulations for the conduct of convoys during the war, was received subject to motion to strike out by proctors for the Rita on the ground that it was an attempt to prove by oral testimony the contents of a written instrument. Although it may no longer be of particular importance as "Mersigs" has since been received in evidence, the motion is granted to the extent of striking out the following testimony:

"Perry, page 14, lines 13 to 18
 page 26, lines 21 to 24;

"Robinson, page 198, lines 9 to 16,
 page 200, lines 3 to 25,
 page 201, lines 1 to 6;

"Delap, page 48, lines 3 to 11,
 page 62, lines 3 to 14;

"Christensen, page 21, lines 2 to 12,
 page 41, lines 4 to 18."

Proposed findings of fact and conclusions of law in accordance with the above to be submitted within ten days.