N. V. STOOMVAART MAATSCHAPPIJ NEDERLAND v. WATERMAN S. S. CORPORATION, Inc., et al.

THE SALAWATI.

THE GATEWAY CITY.

United States District Court
S. D. New York.   Admiralty Division.
April 27, 1949.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for libelant.

Bingham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for respondent—the Gateway City.

John F. X. McGohey, U. S. Atty., by Louis E. Greco, Asst. U. S. Atty, both of New York City, for the respondent—the United States.

RYAN, District Judge.

■ After the filing of the decision herein on January 18, 1949, respondent S/S Gateway City applied to reopen the trial and for permission to offer the testimony of James A. Kirven, Chief Engineer, and Kai de Vermond, second mate of that ship.   The failure of respondent to produce these witnesses and to give plausible explanation for this weighed heavily against it in the determination of the issues presented by the conflicting evidence on the trial.   Satisfactory explanation having been made by respondent, the application to reopen was granted.   Respondent then submitted the testimony of these two witnesses, whose sincerity and truthfulness made a very favorable impression. Libelant, in turn, called Captain Shoemaker, who testified as an expert as to the routine aboard convoy ships during the

706

war and particularly as to the customs and regulations for keeping time on ships traveling in trans-Atlantic convoys.

The entries in the log of the Gateway City considered in the light of the testimony of mate de Vermond as to the custom on that ship, no longer appear unreliable: they are accepted as accurate and original. The testimony of the Chief Engineer, Kirven, and of de Vermond as to the time and circumstances of the routine check of the steering gear, telegraph and telephone has satisfied me of the accuracy of the entries in the rough deck log, and as to the subsequent presence of the mate on deck just prior to the collision. In the light of this testimony, the recital in the letter of May 21, 1943, written by Captain Orrell of the Gateway City giving the time of collision as "5.45 p. m." is clearly error, and the further recital setting the time as "5.00 p. m. 5/21/43" is accepted as true. The 43 minute delay between the time of the collision and the shifting of anchor by the Gateway City, no longer appears unreasonable when one considers that that ship was anchored with 4 shots of chain paid out, that it required 20 minutes to start her turbine engines before the anchor could be raised and 5 minutes per shot to weigh anchor—a total of 40 minutes.

■ As the result of this additional testimony, I have revised my previous view of the case and now find: (1) The vessels were both at anchor at the time of collision; (2) the collision was not caused by negligent navigation of the Gateway City from her anchorage; (3) the collision was occasioned by the movement of the two vessels swinging to the tide.

■ The liability of the Gateway City after she was placed in a compulsory anchorage by a compulsory pilot under war regulations, in such a position that she fouled the berth of the Salawati must be determined as a matter of law. The collision occurring in the harbor of Gibraltar the law of England is to be the measure of liability. Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; United States v. Diekelman, 92 U.S. 520, 23 L.Ed. 742; Hackworth,

Digest of International Law, Vol. VII, p. 198.

On August 24, 1939, under authority of the Defence of the Realm Act (subsec. 4, par. 1), defence regulations were promulgated by the King by Order in Council. Section 43(3), Halsbury's Laws of England, Vol. 33, p. 630, provides that the Admiralty may make a "navigation order" as to the places in or to which vessels may be or go and may generally regulate the movements, pilotage, anchorage, and any other matters appearing expedient to the Admiralty. Failure to comply with such navigation order would constitute an offense and provision was made for its enforcement by any person acting on behalf of His Majesty.

Regulations 21 and 25 promulgated by the Governor of Gibraltar under the Emergency Powers (Defense) Act, 1939 and 1940, and the Emergency Powers (Colonial Defense) Order in Council, 1939 rev. ed. Laws of Gibraltar for 1935, 1941 Supp., provide:

"21. Prohibitions affecting vessels in the Examination Anchorage.

"(1) Except to save life or to avoid accident, or with previous permission from the Examining Officer, merchant vessels in the Examination Anchorage are forbidden to,—

"(a) move the vessel * * *"

"25. Internal Movement—Local Authority Controlling Internal Movement.

"(1) The Captain of the Port will control internal traffic north of a line drawn west true from the north end of the South Mole outside Admiralty Waters. Inside Admiralty Waters the King's Harbour Master will control the traffic.

"(2) No movement in the Port is to take place without the authority of these officers."

The Gateway City was bound under general principles of law, as well as under the special wartime regulations in effect, to obey the orders of the sovereign power in whose port she lay at the time.

■ Ships in convoy are relieved of liability for collision damage when the

collision follows solely as a result of obedience to wartime naval or military regulations. The Ben Hann, 75 Ll.L.Rep. 187; The Vernon City, 70 Ll.L.Rep. 279, affirmed 72 Ll.L.Rep. 223; The Neva, 1 Ll.L. Rep. 478; The Penrith Castle, 1918 Prob. D. 142. The only time that the law allows ships to deviate from these regulations is when a situation of actual and immediate emergency arises. The Lillian E. Kerr, v. Alcoa Pilot, 71 F.Supp. 184, 1947 A.M.C. 610; The Corozal, 62 F.Supp. 123.

A collision caused by obedience to wartime regulations governing anchorage is governed by the same rule of liability as that applicable to convoy cases. The Penrith Castle, supra.

The Diomed, 79 Ll.L.Rep. 526, affirmed 80 Ll.L.Rep. 164, relied on by libelant, is not in point. The opinions there make no reference to any compulsory anchorage regulations such as here present. As a matter of fact, the trial judge concluded that the Diomed gave the Kota Baroe a foul berth, and he added "there was no excuse for the Diomed doing this, nor does she suggest there there (sic) was." If the Diomed had been compelled to anchor too close to another ship, she would undoubtedly have urged this as an excuse for fouling the Kota Baroe's berth.

The Captain of the Gateway City was first assigned a berth of which he complained to both the compulsory pilot and the port authorities. From this latter communication a change of berth resulted which was no better than the first one, and once again he complained although this time only to the compulsory pilot. His reason for not requesting a further change from the port authorities, and which is accepted as entirely substantiated, was that the port was so crowded that a further change would place his ship in no safer a position. Moreover, though there was some potential danger from the proximity of berth of the two vessels, it was not so impending or imminent as to warrant the Captain's taking matters into his own hands and further shifting berth without official permission. Ample evidence of this appears from the fact that the two vessels swung to the tide several times during the more than 48 hours preceding the collision without coming in contact with each other. When the collision did occur, the vessels swung so suddenly that there was neither time nor opportunity for either to take avoiding action.

The collision was not caused by the negligence of either ship; the libel must be dismissed.

Submit findings.