**NATIONAL BULK CARRIERS, Inc. v. UNITED STATES et al.**

**BURNS STEAMSHIP CO. v. THE NASHBULK et al.**

**THE RUTGERS VICTORY.**

United States District Court
S. D. New York.
July 22, 1948.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for National Bulk Carriers, Inc.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Adrian J. O'Kane, of counsel), both of New York City, for Burns Steamship Company.

John F. X. McGohey, U. S. Atty., and Burlingham, Veeder, Clark & Hupper, all of New York City (Chauncey I. Clark and Adrian J. O'Kane, both of New York City, of counsel), for the United States.

KENNEDY, District Judge.

On September 27, 1946, at 4:33½ P. M., Eastern Standard Time, S. S. Nashbulk collided with S. S. Rutgers Victory on the high seas at a point about 225 miles south by east of New York. Nashbulk's port bow struck the starboard side of Rutgers Vic-

tory abreast of No. 4 hatch aft of the amidship house at a point about 175 feet from the stern. The angle of collision was about 45°. It caused the fore peak of Nashbulk to be holed, and several plates to be ripped on the port bow. Rutgers Victory was holed on her starboard side abreast the No. 4 hatch. Her No. 4 hold was completely flooded and part of her coal cargo was lost through the gash in the side of the ship. She later made a port of refuge.

Prior to the collision Rutgers Victory, bound from Philadelphia to Antwerp with a cargo of coal, was on a course 080° true, speed 14½ knots. Her draft was 28' 6¾". This ship is listed in Lloyds Register as a steamship 439.1 feet long, 62.1 feet beam, 34.5 feet moulded depth, 7607 gross tons. She was built at Los Angeles, California, in 1945 and is powered by two General Electric steam turbines geared to a single shaft. She was at the time of the collision owned by the United States and operated under bare-boat charter by libelant Burns Steamship Company.

Nashbulk, on September 27, 1946, was bound from Venezuela to Portland, Maine, with a cargo of petroleum products in bulk, her draft being 31' 7". She was, just prior to the collision on a course 356° true, and was making 16 knots. Nashbulk is a tanker 542.6 feet long, 80.2 feet beam, 40.1 feet moulded depth, 14164 gross tons. She was built at Norfolk, Virginia, in 1945, and is powered by two Westinghouse double reduction steam turbines geared to a single shaft.

Just before the watch on Nashbulk was changed at 4:00 P. M., Eastern Standard Time, Rutgers Victory was sighted by Nashbulk 7 or 8 miles away, 4 points on her own port bow. The weather was fine and clear, the wind from northeast, force 2, and the sea calm. Nashbulk's chief mate took over the watch at 4:05 P. M. and kept Rutgers Victory constantly under observation until 4:15 P. M. When at that time he saw that the bearing of Rutgers Victory had not altered, he shifted to hand steering on the chance that he might have to change course. At 4:25 P. M., the bearing being still the same, he called the master and informed

him of the situation. At that time two miles separated the two ships.

It later developed that Rutgers Victory had no lookout.[1] The officer on Rutgers Victory charged with the watch had left the bridge and was working out a sight at a desk in the rear of the wheelhouse. Thus, to reiterate, at 4:25 P. M. the Rutgers Victory, the burdened ship, was sailing blindly into the jaws of collision. Nashbulk, the privileged ship, was two miles away.

At 4:32 P. M. when Rutgers Victory was less than a half a mile away, still bearing 4 points on the port bow of Nashbulk, the master of the latter reduced his engines to slow ahead and put his rudder hard right. He sounded no whistle signal at this time. One minute later (4:33 P. M.) he sent his engines full speed astern. Ten seconds still later he blew three blasts. The collision, as I have described it, occurred at 4:33½ P. M.

The only maneuvers made by Rutgers Victory commenced at the sounding of the three-blast signal by Nashbulk. At this point her watch officer woke up and went out on the bridge. His first order was "hard left rudder". No order whatever was given to the engine room. Seconds before the actual collision the rudder of Rutgers Victory was shifted to hard right. The prior movement of the helm had, nevertheless, then taken effect, because the master of Rutgers Victory was able, by looking at her wake, to see that there had been a visible alteration of course to port.

Rutgers Victory is not able to deny that certainly until 4:25 P. M. she was grossly at fault. The conduct of her watch officer in failing to post a lookout, no matter how fine the day was, and in secluding himself in the charthouse while the ship drove blindly on cannot be explained or condoned. But Rutgers Victory urges that this "inadvertence" is "insulated" by the plain fault of the Nashbulk.

In the brief of Rutgers Victory, it is said:

(1) that the collision was directly caused by failure of Nashbulk to sound a one-blast signal at 4:32 P. M. when she put her rudder hard right.

---

[1] It is said in the brief of Rutgers Victory that no lookout was necessary "under the prevailing weather conditions of unlimited visibility and no wind or sea".

(2) that between 4:15 P. M. and 4:33½ P. M. Nashbulk had ample opportunity to avoid collision, but failed to take timely or appropriate action; that even as late as 4:32 P. M. Nashbulk could have avoided collision had she had at that instant reversed her engines.

(3) that Nashbulk is disabled to argue that her maneuvers were made in extremis.

I proceed to an analysis of these contentions in the order in which I have stated them.

### Nashbulk's Failure to Sound One Blast When She Turned to Starboard at 4:32 P. M.

In her argument under this point Rutgers Victory insists that Nashbulk, at 4:32 P. M., plainly violated Article 28 of the International Rules, 33 U.S.C.A. § 113, which, to the extent that it is relevant here, provides that a ship directing its course to starboard must sound one blast. The master of Nashbulk justifies his failure to make any whistle signal when he gave the order for hard right rudder by saying that he was not actually changing his course but had, by 4:32 P. M., made up his mind to head away from the danger and reduce his speed. He felt, apparently, that under such circumstances, he was not bound to make the signal for a change of course to starboard.

I think everyone would agree that Article 28 has no application to the case of a ship clearly in extremis. Were it otherwise, it would indeed be possible to charge Rutgers Victory with additional fault in this case, because she did not sound two blasts at 4:33 P. M. plus 10 seconds, and one blast thereafter an instant prior to the collision, a manifest absurdity. The fact is that once one adopts the hypothesis that ships are in extremis, he must take with it all the incidents of such a situation: that the ships are so close aboard as to be within plain sight of each other, that everyone on each bridge is navigating desperately to avert collision, and that time is so short as usually to make ridiculous the suggestion that either ship can be benefited by the disclosure of the other's intentions with respect to heading.

Orders to the wheel in such a situation are not in any real sense calculated to make changes of course, at least within the meaning of Article 28. The rule of special circumstances has, by now, come into force, and the time for studied changes of course, to be duly notified, has passed.

But Rutgers Victory cites seven American cases and three English cases on the proposition that, even though she was the privileged ship, Nashbulk's conduct must be condemned under Article 28, which conduct put her under the burden of showing that her omission *could not* have contributed to the disaster.

The American cases cited by Rutgers Victory on this point are, in the order in which they appear in her brief, as follows: Socony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 1946, 153 F.2d 773; The Comus, 2 Cir., 1927, 19 F.2d 774; The Cushing, D.C.S.D.N.Y.1920, 266 F. 570; The Manitoba, 1887, 122 U.S. 97, 7 S.Ct. 1158, 30 L.Ed. 1095; The Corozal, D.C.S.D.N.Y. 1944, 62 F.Supp. 123; The James McGee, D.C.S.D.N.Y.[1], 1924 A.M.C. 1413, not officially reported; and The Hawaiian, D. C. S.D.N.Y.[2], 1931 A.N.C. 1987, not officially reported.

The English cases relied upon by Rutgers Victory are: The Atland, 1943, 76 Ll.L.R. 38; The Testabank, 1941, 70 Ll.L.R. 270, 72 Ll.L.R. 6; and The Jean Jadot, 1943, 75 Ll.L.R. 153.

Turning first to the American cases, it is clear to me that while excerpts from the various opinions, taken from the context might seem to support the position of Rutgers Victory, the cases themselves do not. It is true that in Socony Vacuum Transp. Co. v. Gypsum Packet Co., supra, Judge Learned Hand speaks of a change of as little as eight degrees as a change of course. But actually he was condemning the holding-on ship for altering her course; this change was made at a time when there was no certainty of collision, and, in fact, the ships would not have collided had each kept her course and speed. The Voco, therefore, violated her statutory duty toward Gypsum Prince (to hold on) even though

---

[1] It is said in the brief of Rutgers Victory that no lookout was necessary "under the prevailing weather conditions of unlimited visibility and no wind or sea".

[2] No opinion for publication.

she sounded one blast when she made the change.

All the other American cases mentioned by Rutgers Victory have features in common, which clearly distinguish them from the case at bar. In each one of them, as the two ships which ultimately collided approached each other the bearing was so fine that one or both of them diagnosed the position either as a head-on meeting or a parallel course situation. It is true that in every one of those cases the court arrived at a conclusion that a crossing situation in fact existed. But, to take them one by one, in The Comus, supra, the courses of the two ships were practically directly opposite, and one of them bore from ¾ to 1½ points on the starboard bow of the other. In The Cushing, supra, one ship was on course north 50° east, the other on course south 40° west (practically opposite). Cushing first made out Proteus "narrow on her starboard bow", and Proteus supposed Cushing to be dead ahead or fine on the port bow. In The Manitoba, supra, the ships were proceeding in directions nearly opposite to each other. Just prior to the collision, Manitoba had Comet's green light ¾ of a point on her starboard bow. In the Corozal, supra, one ship was on course 285° true, and the other on course 117° true. The watch officer on Pierce thought the ships were on parallel courses; the watch officer on Corozal thought that Pierce bore ¾ to a point on Corozal's port bow. In the James McGee, supra, one of the ships (Lake City) was on course east by north, the other (McGee) on course west by south. Lake City made out McGee's green light two points off the port bow, but the latter's masthead light was on Lake City's starboard bow. Finally, in The Hawaiian, supra, the circumstances were utterly unlike those that must be dealt with here. When The Hawaiian found herself approaching a convoy, the lead ship being Tresillian, she directed her course to starboard but sounded no whistle signal. She passed Tresillian safely but was in collision with Larchgrove, which had been close under Tresillian's port quarter. It was said that Hawaiian should have sounded the one-blast signal to Tresillian, and that had she done so, Larchgrove's navigation might have been changed.

Much the same distinction runs through the English cases cited in behalf of Rutgers Victory. In The Testabank, supra, the ships were on practically opposite courses (Ceramic on course 133½° true, Testabank on course 317° true). When a mile separated the vessels, Ceramic starboarded without blowing any signal, and this was held to constitute negligence. The Atland and Jean Jadot, supra, are both convoy cases. In the first case mentioned, S. S. Cape Corso was maneuvering so that there was a "substantial porting for a *substantial* time" (italics mine). She was held at fault for not sounding two blasts. In The Jean Jadot, supra, S. S. Alex was being overtaken by The Jean Jadot. The former made an alteration of 4° to port. Mr. Justice Bucknill thought that this was clearly action to avoid collision and that being so it was the duty of Alex under Article 28 to sound two short blasts, which she failed to do.

The only conclusion possible, as I see it, is that none of these cases truly supports the argument made by Rutgers Victory. Substantially, they stand for the principle that when ships are meeting head-on, or nearly so, or overtaking each other, Article 28 is to be rigidly observed, certainly before the crisis has arrived. When ships are nearly in line with each other on a fine bearing, it can often happen that either ship or both may not be clear whether the starboard-hand rule applies, or whether it is strictly a case of meeting. It may be fraught with danger for either or both to hold course and speed. Therefore, the prompt alteration of course, accompanied by a signal, becomes of paramount importance, even though it be determined later that the starboard-hand rule applied. On the other hand, where there can be no doubt of the application of the starboard-hand rule, premature alteration of course, whether accompanied by a signal or not, becomes a fault on the part of the holding-on ship. And here from the beginning there never could have been the slightest doubt that the starboard-hand rule applied. Nashbulk was under a clear and positive obligation to hold her course until prudence dictated otherwise, and when that happened, Article 28 ceased to have any application. For, as I have said, if she changed her course be-

fore that mysterious moment in extremis had arrived, she would have been condemned, as Judge Learned Hand condemned The Voco in Socony Vacuum Transp. Co. v. Gypsum Packet Co., supra, even had she blown the signal.

Beyond this, it is extremely difficult to find any causal connection between the failure on the part of Nashbulk to make a one-blast signal at 4:32 P. M. and the collision. I think Rutgers Victory realizes that she is on weak ground here, because her main contention seems to be that a one-blast signal at 4:32 P.M. would have served to wake up the watch officer of Rutgers Victory a little more than a minute earlier than actually happened. The suggestion is not so much that he would have navigated his ship differently, but that he would have put on left rudder at an earlier moment, and diagrams are exhibited to show that this would have averted the disaster. Perhaps in inland waters an alarm signal of four blasts might have been appropriate at 4:32 P. M. when Rutgers Victory put her rudder to the right. But this signal is not in the International Code. Therefore, if Nashbulk really thought that disaster was imminent when she put on right rudder, she was certainly in a quandary as far as signals were concerned. To say that she should have blown a warning blast presupposes that she knew that Rutgers Victory's watch officer had completely abandoned his duty and his post, and needed to be waked up. And had she done so, I feel sure that she would have been charged with a deceptive signal (there being no such thing as a warning blast). Had Nashbulk blown four blasts, by analogy with the inland rules, I am quite sure that she would likewise have been charged with making a deceptive signal. If Nashbulk's master was in fact merely trying to check the way of his ship by the use of rudder and engines, as I believe he was, I see no reason for the sounding of any signal at all. For, if he really guessed the extraordinary situation aboard the bridge of Rutgers Victory, he deserves to be condemned for the navigation of his ship from the moment of the guess. But no one could possibly make a finding concerning the time when the master of Nashbulk ought to have realized that a 7,000 ton ship like Rutgers Victory was derelict on the high seas, without lookout or watch officer. Such a condition is, or should be so remote from reality that no seaman could be expected to form the wild conjecture that it existed. And so I can find no causal connection between the collision and the failure on the part of Nashbulk to sound a whistle signal at 4:32 P. M.

### Was Nashbulk Properly Navigated?

I now turn to the question whether Nashbulk was properly navigated. Certainly up to 4:32 P. M. no one ought to condemn her for holding her course. Rutgers Victory, in its own argument under another point, urges strenuously that had Nashbulk blown one blast at 4:32 P. M., and had the watch officer of Rutgers Victory heard it, then the maneuver of the latter to port would have averted collision. This is as much as to say that 4:32 P. M. was not too late for evasive action by both ships had Rutgers Victory been on the alert, as Nashbulk was. Rutgers Victory, despite this, does argue also that Nashbulk should have done something earlier than 4:32 P. M. I do not believe it is necessary in this connection to reiterate what I have already said concerning the consequences of a premature alteration of course by a holding-on vessel.

When Nashbulk did decide that the situation called for evasive action, she reduced her speed and turned sharply to starboard (4:32 P. M.), and one minute later (4:33 P. M.) she backed her engines full speed and blew a backing signal. What else could she have done? Rutgers Victory now asserts that Nashbulk should have backed full speed at 4:32 P. M. But this argument is colored by hindsight. No doubt, if any reason existed why Nashbulk should have assumed that Rutgers Victory was no better than a derelict, she would, at 4:32 P. M., have entered upon the drastic maneuver of sending her engines from ahead to full astern. But Nashbulk was not called upon to make the assumption that I have mentioned: he had a right to assume that Rutgers Victory, even though the burdened ship, was in a condition to avoid collision so far as she then had the means at hand. And Rutgers Victory clearly takes the position in the briefs and diagrams that at 4:32 P. M. Rutgers Victory did have the means of successful evasive action.

■ I confess that I am unable to find any substantial fault on the part of Nashbulk in respect of navigation, unless the probabilities are discarded and she is charged with the duty of guessing that Rutgers Victory, until 4:33 P. M., was helpless.

### All of Nashbulk's Maneuvers Were Made in Extremis.

Rutgers Victory now advances the ingenious argument that Nashbulk is disabled to excuse her faults of navigation, if she committed any, on the ground that she was in extremis through her own fault. It has already been said that at 4:20 P. M. the chief officer of Nashbulk called his master to the bridge and informed him that some action would be necessary if the bearing between the ships did not change. He had already (at 4:15 P. M.) shifted to hand steering. Rutgers Victory reads these facts to mean that at 4:25 P. M. the crisis had already developed and, therefore, Nashbulk should not be allowed to shield herself from blame for any faulty action that she took later. I suppose there is no more vexed question than the determination of the exact moment when the holding-on ship is justified in departing from her statutory duty under Article 28 and in leaving her course, on the theory that evasive action has now become essential, and that the starboard-hand rule no longer applies. Premature action carries a heavy penalty; under the American system the penalty is often heavier than that which would be applied under the British rule for the division of damage. One of the most important tests is subjective: whether the conduct of the master of the holding-on ship has conformed to the dictates of prudence and skillful seamanship, under the probabilities of the case as a prudent seaman would view them. Naturally, it is impossible to draw any hard and fast line.

But here it is clear beyond any doubt that, given minimum reasonable behavior on the part of Rutgers Victory, 4:25 P. M. was too early for a change of course by Nashbulk. And indeed, as I have said in another connection, Rutgers Victory inferentially admits that even 4:32 P. M. was not too late. I have hinted that Nashbulk would probably have been condemned for a deliberate change of course prior to 4:32 P. M., whether she signalled that change or not. The collision itself proves that Nashbulk might well have been condemned if she waited later than 4:32 P. M. to take rudder and engine action. Faced with such a Hobson's choice, the master of Nashbulk is certainly not to be criticized, especially in the light of the glaring misconduct of Rutgers Victory, merely because it turned out that collision was not in fact averted, or because he did not take into his calculations the startling fact that the watch officer of Rutgers Victory had left the bridge to do his sums.

### Conclusion

■ It is my conclusion that the disaster is accounted for solely by the gross fault of Rutgers Victory, that the behavior of Nashbulk and the measures taken by her were prudent and skillful, that the owners of Nashbulk are entitled to an interlocutory decree in the usual form against the ship and respondent Burns, and that they are entitled to a dismissal on the merits of the libel against them with costs.

I have filed findings of fact and conclusions of law.