ANGLO–AMERICAN OIL CO., Ltd. v. UNITED STATES and Eight other Cases.

The GEORGE W. McKNIGHT.

The HOWARD L. GIBSON.

The STEPHEN T. MATHER.

United States District Court
S. D. New York.
June 14, 1951.

Kirlin, Campbell, Hickox & Keating, New York City (Ira A. Campbell, Eugene F. Gilligan and Raymond T. Greene, New York City, of counsel), for libelant Anglo-American Oil Co.

Irving H. Saypol, United States Atty., New York City (Alfred T. Cluff, Special Asst. to the Atty. Gen., of counsel), for the United States, owner of The Howard L. Gibson.

Hunt, Hill & Betts, New York City, of counsel for U. S. Atty. (George Whitefield Betts, and Helen F. Tuohy, New York City, of counsel), for the United States as owner of The Stephen T. Mather.

Atkins & Weymar, New York City (Horace T. Atkins, New York City, of counsel), for libelant Asbury McIntosh, Administrator of Estate of Gerald Berl Grove.

Bigham, Englar, Jones & Houston, New York City (Charles A. Van Hagen, New York City, of counsel), for libelants Firemen's Fund Ins. Co., et'al.

Mendes & Mount, New York City (H. W. Dieck, New York City, of counsel), for Borax Consolidated, Ltd.

COXE, District Judge.

These suits grow out of a collision in the North Atlantic on the night of October 14, 1944, between the Liberty ship "Howard L. Gibson", owned and operated by the United States, and the "George W. McKnight", a British merchant tanker, owned and operated by Anglo-American Oil Co., Ltd., a British corporation. Another United States vessel, the Liberty ship "Stephen T. Mather", due to the failure of her gyro compass, strayed from her assigned position in the convoy, and is charged with faults contributing to the collision. All of the involved vessels were in the same wartime convoy, consisting of about 70 ships, proceeding eastward from Norfolk, Virginia, to the Mediterranean.

In the collision the bow of the "Gibson" struck the port side aft of the "McKnight", approximately 190 feet from the stern, and at an angle of about 65 degrees, cutting into a tank containing high octane gasoline, and causing extensive fires to break out on both vessels. Both vessels were thereupon abandoned, but, later, parts of the crews came back, and, with help from the Navy escort vessels, the fires were brought under control and the damaged vessels proceeded to African ports, where temporary repairs were made, and the vessels subsequently returned to the United States. Seven lives were lost in the collision, but only one death claim is asserted.

There are nine separate suits involved in the litigation, and all have been consolidated for trial under a single title. Some of these suits are duplications, and may be disregarded. Those remaining consist of the following:

(1) A suit by Anglo-American Oil Co., Ltd., against the United States, owner of the "Gibson" and "Mather", for collision damages; (2) a cross-suit by the United States against the "McKnight" and her owner, for damage to the "Gibson" and her Government-owned cargo; (3) two suits by owners and underwriters of privately-owned cargo on the "Gibson" against the "McKnight" and her owner, for cargo damage, in which the United States has been impleaded; (4) a suit by the Administrator of a member of the "Gibson's" Navy Armed Guard, who lost his life in the collision, against the "McKnight" and her owner, for wrongful death, in which the United States has been impleaded. In all of the suits the ship owner sued has claimed the benefits of the statutes for limitation of liability.

All of the witnesses for the "McKnight", with one minor exception, testified by deposition. For the "Mather", two witnesses testified by deposition and six testified at the trial. For the "Gibson", three witnesses testified by deposition, two testified at the trial, and the statements of two others were stipulated.

The ships in the convoy were arranged in thirteen parallel columns, numbered consecutively from left to right, and except for the 7th and 13th columns all of

the columns had five or six ships. The prescribed distance between columns was 1000 yards and between ships in column 500 yards. The 13th column was a short column, with only four ships. On the night of October 14, 1944, the "Mather" was No. 104, or the fourth ship in the 10th column; the "Gibson" was No. 114, or the fourth ship in the 11th column; and the "McKnight" was No. 126, or the sixth and last ship in the 12th column. Two other convoy ships, namely, the "Vachel Lindsay", No. 124, and the "Cornelius Ford", No. 125, have been drawn into the testimony; these ships occupied the fourth and fifth stations, respectively, in the 12th column.

The "McKnight" was a Diesel-driven, twin screw vessel, 540 feet in length, 70.2 beam, 38.9 feet depth of hold, 12,502 gross tonnage, and 7009 net tonnage. The bridge was 200 feet aft of the bow. The top of the wheelhouse, or "monkey island", was 55 feet above the water line, and it was there that the lookout was stationed. The navigation was conducted from the main bridge, just below. The wheelhouse was encased in concrete, with only narrow horizontal slits, or windows, forward and at the sides.

The "Gibson" and the "Mather" were standard Liberty cargo ships, 422.8 feet in length, 56 feet beam, 34.8 feet depth of hold, 7136 gross tonnage, and 4380 net tonnage. These figures do not appear in the record, but have been taken from the "McKnight's" brief, and are not in dispute.

It is not possible to fix the exact time of the collision, for the ships were keeping different times due to the change in time from one time zone to another. The "Mather" witnesses placed the time of the collision at about 8:25 P.M.; those on the "Gibson", at about 7:40 P.M., and those on the "Mc-Knight", at about 8:00 P.M.

The convoy was proceeding on a course of 90 degrees true, i. e., due east, and all of the vessels were blacked out. The official speed was 9½ knots, but the evidence indicates that the ships were making something more than that, or about 10 knots. The night was dark; there was no

moon; the weather was clear, with stars overhead; there were some broken clouds in the east, and the sea was moderate, with no appreciable wind. There is a dispute in the testimony as to the visibility, and that will be dealt with later. At about 4:00 o'clock on the afternoon of October 14th, a general message was sent out by the Commodore to all ships in the convoy, warning against submarines in the vicinity.

### Navigation of the "Mather".

The "Mather", No. 104, as already stated, was the fourth ship in the 10th column, and her beam ship on the starboard side was the "Gibson", No. 114, or the fourth ship in the 11th column. The navigation was being conducted by gyro, from the flying bridge. There were two lookouts stationed on the bow of the vessel, one a member of the Navy Armed Guard and the other a merchant seaman. Another merchant seaman was acting as lookout on the starboard wing of the flying bridge. The watch officer on the 8:00 to 12:00 P.M. watch, on October 14th, was McBride, the third mate, who testified at the trial. The master of the vessel was Captain Gavin, and his testimony was taken by deposition. The member of the Navy Armed Guard, who acted as one of the two bow lookouts, was Dougherty, and he testified at the trial.

McBride testified as follows: He came on watch at 7:40 P.M. according to the ship's clock, and could then "barely make out the 'Gibson'", which was "lagging" about four points abaft the "Mather's" starboard beam. The outlines of the ship on the port side could, however, be seen "fairly well". There were "dark clouds coming from the east, and periodically they would black out everything dead ahead", but this condition would only "last momentarily, maybe two or three minutes", and when the clouds "lifted, you could make out the outlines" of the ships ahead. These clouds did not at any time black out the vessels to port or starboard. Shortly after 8:00 o'clock, or about 25 to 30 minutes after McBride came on watch, he noticed "a sudden flash of ships" across his bow. He immediately called to Cameron, the helmsman, asking for his heading, and

Cameron answered that "he was right on the course". McBride thereupon ran over and looked at the gyro himself, and found that the heading as shown by the gyro was 90 degrees true, which was the convoy course. "Within a minute or so afterwards" one of the bow lookouts called out "Ship dead ahead". McBride also saw this ship, which he said was a Liberty ship, (apparently the "Vachel Lindsay", No. 124), and he ordered the wheel "hard right", clearing the Liberty ship's stern "very close". He then sent for the captain. During this period of about 25 to 30 minutes after McBride came on watch, the "Mather" had swung to the right, away from the line of the 10th column, had passed through the 11th column, and had reached the 12th column, and yet, according to McBride's testimony, it was not until he had seen the "sudden flash of ships" across his bow, and had looked at the gyro himself, that he "knew something was wrong".

Captain Gavin testified as follows: He was on the bridge looking around at "about 8:00 o'clock", on the change of the watch, but he apparently remained there only a very short time before going to his office on the deck below. (Gavin's time of "about 8:00 o'clock" seems to synchronize with McBride's time of 7:40 P.M., when he came on watch, as Gavin said that he started advancing his clocks 20 minutes each watch at 6:00 P.M., whereas McBride said that the ship's clock was not advanced at all until midnight.) Gavin's testimony regarding conditions at 8:00 o'clock was that the "Mather" was then "about right in her position"; it was dark, but "if a man had been in his position he could have seen the ship ahead of him with his naked eye; he could have seen the lead ship of the column with a pair of glasses; and he could have seen the ships "on either side".

At about 8:25 P.M., while Gavin was in his office, he was called to the bridge by McBride, and on reaching the bridge he noticed a ship on the starboard beam showing a red light—a "port running light". (This ship was identified at the trial as the "Ford", No. 125.) On seeing the red light Gavin asked the helmsman

what the heading was, and was told that it was 90 degrees true. He then directed the helmsman to haul "a little to the left", to clear the ship (i. e., the "Ford"), "about a ship's length away", and almost immediately afterwards the red light disappeared and the "Mather" passed out of the convoy, through the line of the 12th column, between the stern of the "Lindsay", No. 124, and the bow of the "Ford", No. 125.

Soon after the "Mather" had passed out of the convoy, there was an explosion, followed by flames, from the two ships in collision ("Gibson" and "McKnight"), about two or three points on the "Mather's" starboard quarter, and "about a thousand feet away". By this time Gavin's eyes had become adjusted to the darkness, but he could not understand why there were no ships ahead or alongside, and he asked McBride where the convoy was and what happened, to which McBride replied that "he thought they had scattered".

Gavin further testified as follows: "Well, I glanced back astern, and I noticed these stars I had seen at 8:00 o'clock, when I was on the bridge, Capella and Pleiades; at 8:00 o'clock they were right ahead, and at that particular moment they were astern." Upon seeing these stars, Gavin had Negoescu, the chief mate, check the course by the standard compass on the flying bridge, and it was ascertained that the "Mather" had reached a course of 270 degrees true, which was due west, or directly opposite to the convoy course of 90 degrees true. An examination was then made by Cull, the second mate, of the master gyro in the chart room just off the Captain's office, and it was found that the latch inside the compass for locking the phantom and vertical rings was in locked position, with the result that the lubber line remained constant over an indicated compass card heading of 90 degrees, although the ship's heading had actually changed.

Dougherty testified as follows: He went on watch as one of the two bow lookouts at "approximately a quarter to eight"; the silhouette of the ship ahead could then be seen, and she appeared to be in her

regular station. He also "took notice of a cluster of stars called the Seven Sisters" (the Pleiades), which were "right above forward of us", but he paid no attention to them afterwards. "Not two long after being on watch", he "spotted an object coming across the bow, about two or three points off the starboard bow", and "immediately called to the bridge", but received no response; he thereupon yelled to the bridge that there was "a ship dead ahead coming across the bow", and to go "hard right". Except for this ship right ahead, he saw no other ships ahead "or around". Soon afterward he saw the fire from the collision, and went to his battle station.

The gyro compass had been installed, tested, and passed by the Sperry Gyroscope Company at the commencement of the voyage, and it operated satisfactorily until the night of the collision. After the collision efforts were made, without success, to ascertain the cause of the failure of the compass, and on two subsequent occasions; in January and in February 1945, the compass again broke down as a result of precessing.

There were two steering compasses on the flying bridge, one a gyro repeater and the other a standard magnetic compass. Both of these compasses were located in front of the steering wheel, and were in plain sight of the helmsman, the gyro repeater being a little to the left and the standard compass slightly to the right of the wheel. Prior to the collision, the standard compass was occasionally used in the daytime to check with the gyro repeater, but on the night of October 14th the standard compass was not lighted and the binnacle cover was off. In order, therefore, to look at the standard compass on that night it was only necessary to put on the binnacle cover and turn on the light.

### Navigation of the "Gibson".

The "Gibson", No. 114, was on her maiden voyage and bound for India with general cargo; her beam ship on the port side was the "Mather", No. 104, and her beam ship on the starboard side was the "Lindsay", No. 124. At no time prior to the collision did the "Gibson" put on any navigation lights or sound any whistle signals. Captain Grant, the master, and Brooks, the chief mate, both testified at the trial, Brooks having been the watch officer on the 4:00 to 8:00 P.M. watch. There were two Navy lookouts on the bow of the vessel, and both lost their lives in the collision. Another merchant seaman, Hughes, was acting as lookout on the flying bridge, and his stipulated statement is in evidence. As part of the "Gibson's" case, also, there are depositions of three witnesses from the "Ford", No. 125. No change in time was made by the "Gibson" prior to the collision.

Brooks testified as follows: He was on the flying bridge just prior to the events leading to the collision. The visibility was then "very good", and the ship next ahead, No. 113, was about 1800 feet away, and could be clearly seen. The "Lindsay", No. 124, was abeam on the starboard side, and the "Mather" "had been increasing her speed for a few minutes" until she was about abreast of the "Gibson's" next ahead, No. 113, and bore "at least four points" on the "Gibson's" bow. The "Mather" then "started getting off her course with a bearing towards the right", and she "came pretty sharply after she started". This movement of the "Mather" was very clearly" seen and reported by the lookouts. Brooks watched the "Mather" to see if she would straighten in her column, but when he saw that "she was still coming" towards the 11th column he realized that "there was something wrong" with her, and he sent for the Captain.

After sending for the Captain, Brooks saw that the "Mather" was "getting towards" the "Gibson", and he ordered "some right rudder", which was executed by the helmsman. At the time this order was given the "Mather" was "about three ship lengths, about 1500 feet", distant from the "Gibson". Captain Grant came to the bridge within a minute after he was called, and Brooks explained the situation to him and showed him the "Mather", which was then "around the middle between the 10th and 11th columns". The Captain then ordered the engines stopped. The compass heading of the "Gibson" at that time was 136, and Brooks told the helms-

man to take some of the wheel off, as the "Gibson" was coming "too fast towards the right". The helmsman accordingly "eased the wheel gradually", and from then on the Captain was in charge.

The "Mather" continued coming towards the "Gibson", and when the "Gibson" was about half a ship's length from column 12 the "Mather" crossed the "Gibson's" bow, about 900 feet away, and passed out of the convoy through column 12. In the meantime, another Liberty ship (the "Ford", No. 125) was seen coming up on column 12, about 900 feet away, and bearing on the "Gibson's" starboard bow. Captain Grant thereupon ordered the "Gibson's" rudder "hard right" and the engine "half ahead", in order to pass astern of the "Ford". The "Ford" cooperated by applying a left rudder; she also put on her lights and blew signals. The result was that the "Gibson" cleared the stern of the "Ford" by about 50 feet, and at a speed of about 5 knots.

After the "Gibson" had cleared the "Ford", Captain Grant ordered "hard left rudder", followed immediately by "hard right rudder". Brooks said that he knew there was another ship (the "McKnight", No. 126) coming up behind the "Ford", but he did not see her at the time the hard right order was given. Shortly afterwards Brooks did see this ship (i. e., the "McKnight"); she was then "heading on the convoy course", "about a ship length and a half" away, and bearing on the "Gibson's" starboard bow. The "Gibson" continued swinging to her right under her hard right rudder, and "there was no observable change in course or speed" on the part of the "McKnight". The engines of the "Gibson" were put "full astern", "either at the collision or a matter of a few seconds before", and the point of impact was on the port side aft of the "McKnight", "around the No. 9 tank, the last tank", as shown on the diagram, "Gibson's" Exhibit I, made by Brooks at the trial.

Captain Grant's testimony was as follows: He went directly to the flying bridge when called by Brooks, and on his arrival there saw a ship (the "Ford", No. 125) "right dead ahead", about 125 feet away, and heading approximately at right angles

to the heading of the "Gibson". He thereupon ordered the wheel "hard right", and then "hard left", clearing the ship's stern by about 5 feet. After clearing this ship Grant went back to "hard right", "to get back into the clear"; he knew that there was another ship astern of the one he had just avoided, but he did not expect to see any ship where he was turning. Within two or three minutes afterwards, the "McKnight" appeared "right across" the "Gibson's" bow, about 20 feet away, and so close that by the time Grant got to the telegraph and rang "full speed astern" the collision occurred. The bow of the "Gibson" struck the "McKnight" at about the No. 8 tank, and at an angle as shown on the Brooks diagram. ("Gibson's" Exhibit I, showing a 65 degree angle.)

The three witnesses from the "Ford" who testified by deposition were Johnson, the third mate, Captain Young, the master, and Case, a bow lookout.

Johnson testified as follows: He was the watch officer on the 8:00 to 12:00 night watch, and was stationed on the port wing of the flying bridge. He "could see all ships in the vicinity",—the ship next ahead, also "ships in the next column on the port side", and the ship astern. Prior to the collision, which occurred around 8:30 P.M., the "McKnight" was keeping station "slightly on our starboard quarter", and "approximately two ship lengths" distant from the "Ford's" stern. Johnson first observed a ship (the "Mather", No. 104) bearing about three points on the "Ford's" port bow, and heading at right angles across the "Ford's" course. He then turned on the running lights, ordered left wheel, stopped the engines, and called the Captain. This ship (i. e., the "Mather") crossed ahead of the "Ford" "very close", and the "Ford" remained under left wheel, and with engines stopped, for two or three minutes thereafter. About the time that this first ship crossed ahead, Johnson saw a second ship (the "Gibson", No. 114) coming on the port side, and heading for the "Ford's" "midships". This second ship was turning to the right, and cleared the "Ford's" stern "very close". The Captain sounded a U signal—two shorts and a

long,—the convoy danger signal, as soon as he reached the bridge. This signal was intended for the "Gibson".

Captain Young testified as follows: He was on the flying bridge at 8:00 P.M., when Johnson, the third mate, took over the 8:00 to 12:00 watch, and at that time there was "a smooth sea, a fine and clear sky", and "all the ships immediately around", "on both beams and ahead" and directly astern, could be seen "with the naked eye". The visibility for unlighted ships at around 8:00 o'clock was, "say a half a mile". Young left the bridge at about 8:05, and the "McKnight" at that time was "just a little bit off our starboard quarter" and "about two ship lengths astern". Young then went below, and soon afterwards was called back to the bridge by Johnson, the third mate. When he reached the bridge the "Ford" was "swinging a little to the left", and he saw a ship (the "Mather"), about 100 feet away, crossing from port to starboard, and heading about 90 degrees "opposite our course". The engines of the "Ford" were stopped at the time, green and red side lights were on, and Young ordered that the masthead light be turned on also. The crossing ship (i. e., the "Mather") cleared ahead of the "Ford", and Young was then "going to put the wheel hard right and the engines ahead again, when someone sung out that there was a ship ahead (the "Gibson") amidships on the port side". Young saw this ship heading right for the "Ford", "about 100, 150 feet away", bearing at right angles, and heading for the "Ford's" port side midships. Young thereupon ordered the engines full ahead and the wheel hard left, all navigating lights turned on, and the general alarm rung. These orders were promptly executed. The U danger signal—two long and one short—was also sounded. The "Ford" was swinging pretty fast and the "Gibson" cleared her stern "very close". Young saw the collision with the "McKnight", which occurred "approximately five minutes" after the "Gibson" cleared the "Ford's" stern.

### Navigation of the "McKnight".

The "McKnight", No. 126, was proceeding with a cargo of 16,000 tons of high octane gasoline and 17 airplanes, all consigned to the United States Army; her next ahead was the "Ford", No. 125, and there was open sea to starboard due to the shortness of column 13. The deck watches consisted of the watch officer and three seamen who alternated as helmsman, lookout and stand-by. There were two gunners on duty, stationed on the port and starboard sides of the bridge, and their sole duties were to look after the guns, "and nothing else". The regular lookout station was on the "monkey island" above the wheelhouse, and no lookout was maintained on the bow, except in fog or bad weather. Edwards, the chief mate, was the watch officer on the 4:00 to 8:00 P.M. watch, and Cooney was the only lookout on duty from 7:00 P.M. until just before 8:00 P.M., when he was relieved by Kirkpatrick. No whistle signals were sounded, or lights turned on, prior to the collision. Captain Hopkins, the master, Edwards, Cooney and Kirkpatrick, all testified by deposition.

Captain Hopkins testified as follows: He was on the bridge "off and on" during the evening watch, the last time being about half an hour before the collision. The ship next ahead could then just be seen, also the ship on the port side. Shortly before 8:00 o'clock Hopkins was in his room, underneath the bridge, and on hearing the telegraph ring "ran out and went up on the bridge". Upon arrival there he found Edwards in the wheelhouse, and asked him what was wrong. Edwards replied: "I think we are going to have a collision on the port side, but I think we are going to clear". "With that, there was a crash", and Hopkins went out to the port wing and found the ship in flames at No. 8 tank on the port side. The engines were then stopped, the alarm sounded, and the crew ordered to the boats. The collision occurred at "8:00 o'clock approximately", and about five or six seconds after Hopkins arrived on the bridge. Hopkins did not see the "Gibson" at any time prior to the collision.

Edwards testified as follows: On the evening of the collision he was keeping station on the vessel ahead ("Ford", No. 125), "about two points" (22½ degrees) on

the "McKnight's" port bow, and "about two cables" (1200 feet) astern of the "Ford". It was dark at about 6:00 P.M., and very dark, with "limited visibility for blackout ships", shortly before 8:00 P.M. Prior to the collision Edwards had been keeping watch on the "port wing of the bridge", but at some time not stated he went into the wheelhouse, and was there during the "two or three minutes" just before the collision. While in the wheelhouse he "picked up the binoculars to take a look around the horizon", and as he looked ahead he saw a Liberty ship ("Mather", No. 104) dead ahead and broadside to the "McKnight", crossing from port to starboard. He watched this ship for "ten or fifteen seconds" as she passed to starboard, but he made no change in the "McKnight's" helm or engines.

After the "Mather" had passed to starboard Edwards started to look for his next ahead ("Ford", No. 125), but did not see her. He did, however, see a ship which turned out to be the "Gibson", No. 114, bearing "about two points" forward of the "McKnight's" "port beam", and steering a crossing course about six points to the right of the "McKnight's" course. Upon sighting this ship (i. e., the "Gibson"), he immediately placed the helm "hard starboard", the port engine "full ahead", and stopped the starboard engine. The collision occurred at "approximately 8:00 o'clock", and "about thirty seconds" after Edwards had first sighted the "Gibson".

Captain Hopkins came to the bridge "about ten to fifteen seconds" before the collision, and his conversation with Edwards took place in the wheelhouse just prior to the time the ships came together. Edwards had received no reports "at all" from the lookout with respect either to the "Mather" or to the "Gibson". He did not see the ships as they collided, and was unable to state the angle of collision.

Cooney testified as follows: He went on watch as lookout at 7:00 P.M. on the "monkey island", where he had "a clear unobstructed view all over the horizon", and he was relieved by Kirkpatrick "one or two minutes before 8:00", at the turn of the watch. During the hour he was on watch he was "looking out, walking athwartships all the time," and he saw the "Ford" several times, the last time being "between five and ten minutes" before he was relieved. The "Ford" was the only ship he saw during the hour he was on watch. He noticed "nothing unusual" when he turned the watch over to Kirkpatrick, and he proceeded down to the navigation bridge, then to the boat deck, and finally to the ladder to the catwalk leading aft. While descending this ladder he heard the rattle of the engine telegraph chains located underneath the catwalk, looked over to port, and saw the "Gibson" heading for the "McKnight's" side. He was still on the ladder when the collision occurred.

Kirkpatrick testified as follows: He relieved Cooney as lookout on the "monkey island" at "about a couple minutes to eight", and Cooney then left the "monkey island". On taking over the watch, Kirkpatrick first "looked out on the starboard side" and found nothing there; he then "walked over to the port side", and saw the "Gibson" coming towards the "McKnight". He was going to report this ship, but as he went to the voice tube he heard a shout from the wheelhouse "hard to starboard", and did not do so. He kept the "Gibson" under observation, and saw the collision, which he estimated occurred "about a minute" after he had sighted the "Gibson".

*First,—as to the "Mather", No. 104—* When McBride, the watch officer, came on watch at 7:40 P.M., according to the ship's clock (Gavin's time, 8:00 P.M.), the "Mather" was in her assigned position in the line of the 10th column, and at the normal distance astern of her next ahead. McBride said that he could then barely make out the "Gibson", No. 114, which was lagging about four points abaft the "Mather's" starboard beam. This seems to coincide with the testimony of Brooks, the watch officer of the "Gibson", that the "Mather" had been increasing her speed until she bore at least four points on the "Gibson's" bow. However that may be, it is apparent that prior to the events leading to the collision both the "Mather" and the "Gibson" were keeping station properly, regardless of how they bore, relative to each other.

■ With respect to the visibility, it is clear from McBride's testimony alone that there was no difficulty in seeing the vessel next ahead of the "Mather" and the beam vessels on both sides, and I make such a finding. Moreover, there is the testimony of Captain Gavin and Dougherty, one of the bow lookouts, that at the beginning of the watch the cluster of stars known as the Pleiades was directly ahead and clearly seen, and no good reason has been advanced by the "Mather" to explain why this cluster of stars was not observed by McBride in determining the heading of the "Mather" during the critical period when the vessel was moving to starboard, away from the 10th column, through the 11th column, and approaching the 12th column. Neither McBride nor Dougherty seems to have paid any attention whatever during this period to the "Mather's" next ahead, or to the beam vessels on both sides, and McBride never sensed that there was anything wrong until the "Mather" had reached the 12th column, and he had seen the "sudden flash of ships" across his bow. If, when the "Mather" commenced to veer from the 10th column, McBride had known, as he should have known, that the heading of the vessel was changing sharply to starboard, it would then have been a comparatively simple operation for him to have checked the heading, as shown by the gyro repeater, with the standard compass, despite the fact that the binnacle on the standard compass was off and the light had not been turned on. I think this amounted to culpable negligence.

■ The question remains whether the negligence of the "Mather" was a contributing cause of the collision. It was this negligence which forced the "Gibson" out of her position in the 11th column and caused her to become entangled with the "Ford", No. 125, and later to be in collision with the "McKnight", No. 126. These subsequent events did not break the chain of causation between the "Mather's" negligence and the collision. Esso Standard Oil Co. v. United States, 2 Cir., 174 F.2d 182. See also The George H. Jones, 2 Cir., 27 F.2d 665, 668; certiorari denied Societe Anonyme d'Armement d'Industrie Et De Commerce v. James McWilliams, 278 U.S. 649; The Glendola, 2 Cir., 47 F.2d 206, 207, certiorari denied Glendola S. S. Corp. v. Standard Oil Co., New Jersey, 275 U.S. 554, 48 S.Ct. 116, 72 L.Ed. 423; Id., 283 U.S. 857, 51 S.Ct. 650, 75 L.Ed. 1463; Johnson v. Kosmos Portland Cement Co., 6 Cir., 64 F.2d 193, certiorari denied 290 U.S. 641, 54 S.Ct. 60, 78 L.Ed. 557; Cereal Trade & Shipping Co. v. U. S., D.C.S.D. N.Y., 1951 A.M.C. 671, 686. I hold, therefore, that the negligence of the "Mather" was a contributing cause of the collision.

■ *Second,—as to the "Gibson", No. 114.*—It is first charged by the "McKnight", as a fault on the part of the "Gibson", that she turned sharply right, failed to check her speed, and brought herself too close to the 12th column. I find nothing in the evidence to support this contention. It was only ofter the "Mather" was seen to be veering towards the 11th column, and getting closer to the "Gibson", that the order was given by Brooks for "some right rudder". Captain Grant then came to the bridge, and the engines were stopped and the right rudder "eased". The "Mather" crossed the "Gibson's" bow when the "Gibson" was about half a ship's length from the 12th column, and soon afterwards the "Gibson" became entangled with the "Ford". Clearly, the "Gibson's" right rudder was proper to avoid collision with the "Mather", and the other criticisms of the "McKnight", that the "Gibson" failed to check her speed and brought herself too close to the 12th column, are without merit. The Phoebus, D.C.S.D.N.Y., 70 F.Supp. 817, affirmed, Panama Transport Co. v. The Maran, 2 Cir., 165 F.2d 719.

■ It is next charged that the "Gibson" failed to reverse her engines when her rudder was placed hard right in order to pass astern of the "Ford". The engines at that time had been stopped, and Captain Grant ordered them "half ahead". The situation was critical for both vessels, and the "Gibson" needed speed to clear the "Ford", and with the cooperation of the "Ford" the maneuver was completely successful. This surely did not constitute fault on the part of the "Gibson".

■ It is further charged that after clearing the "Ford" the "Gibson" reckless-

ly maintained her speed into collision with the "McKnight". I find as a fact that the "Gibson" cleared the stern of the "Ford" at a speed of about 5 knots, and that this speed was maintained until just before the collision. Captain Grant believed that he was going through the line of the 12th column, and he expected, reasonably, to pass out of the convoy between the stern of the "Ford" and the bow of the "McKnight". If the "McKnight" had been in her proper station, 1500 feet astern of the "Ford", this could demonstrably have been accomplished. The "McKnight", however, was not in that station, but keeping the "Ford" about two points, or 22½ degrees, on the "McKnight's" port bow, and about two cables, or 1200 feet, astern of the "Ford". I hold that the speed of the "Gibson" after clearing the "Ford" was justified.

■ Finally, it is contended by the "McKnight" that the "Gibson" omitted to show her navigation lights and to sound rudder signals. With respect to the lights, the "McKnight" has the burden of showing that the omission was negligent, and at least one cause of the collision. Oriental Trading & Transport Co. v. Gulf Oil Corp., 2 Cir., 173 F.2d 108, 110. I do not think that this burden has been maintained. Under the Regulations governing convoys, lights were "only to be exhibited (a) For avoiding collision, in which case they are to be extinguished as soon as the danger of collision has passed". Publicover v. Alcoa S. S. Co., 2 Cir., 168 F.2d 672, 675. In the present case, there was no necessity for turning on the lights until some occasion arose for doing so, and that occasion did not arise until the "Gibson" saw the "McKnight". Then it was too late, as the "Gibson" at that time was in extremis.

■ With respect to the charge that the "Gibson" failed to sound rudder signals, little need be said, for the case was plainly one of special circumstances which did not require any rudder signals under the facts shown. Luckenbach S. S. Co. v. United States, 2 Cir., 157 F.2d 250, 252; National Bulk Carriers v. United States, D.C.S.D.N. Y., 80 F.Supp. 188.

■ Third,—as to the "McKnight", No. 126.—It is charged that the vessel (1) de-

liberately failed to keep her assigned station in the convey, and (2) completely failed to keep a proper lookout. On the evening of the collision, Edwards, the watch officer of the "McKnight", was keeping station on the vessel ahead, (i. e., the "Ford"), "about two points" (22½ degrees) on the "McKnight's" port bow, and "about two cables" (1200 feet) astern of the "Ford". This was a deliberate violation of instructions on the part of the "McKnight", in that she was not proceeding astern of, and at a distance of 1500 feet from, the "Ford", and is alone sufficient to condemn her. Luckenbach S. S. Co. v. United States, supra.

■ The "McKnight" was also at fault for lookout failure. Three seamen alternated as helmsman, lookout and stand-by on the vessel, and Cooney was the only lookout on duty from 7:00 P. M. to just before 8:00 P. M., when he was relieved by Kirkpatrick. The regular lookout station was on the "monkey island", above the wheelhouse, and no lookout was maintained on the bow of the vessel on the evening of the collision. This failure to have a lookout on the bow was clearly a fault under well settled law. The Manchioneal, 2 Cir., 243 F. 801, 805; The Buenos Aires, 2 Cir., 5 F.2d 425, 431–432; The Paris, D.C.S.D. N.Y., 37 F.2d 734, affirmed 2 Cir., 44 F.2d 1018; Oriental Trading & Transport Co. v. Gulf Oil Corp., 2 Cir., 173 F.2d 108, 111.

It is, however, insisted on behalf of the "McKnight" that under the British Board of Trade requirements it was proper to place the lookout on the "monkey island", and not on the bow of the vessel. In the deposition of Captain Hopkins, taken at Baltimore on March 22, 1945, he was asked by counsel for the "McKnight" what the Board of Trade requirements were with respect to the posting of lookouts, and, over the objection of opposing counsel, the witness made the following oral statement: "Well, since the war has begun we have to have lookouts day and night and they have required us to put a man on the monkey island instead of the bow for safety reasons, the idea is if you keep the man close enough you may be able to save lives * * *. But, as soon as foggy weather, misty weather, or heavy rain comes in, we

778

are supposed to keep a lookout on the forecastle head." No written or other proof was offered on behalf of the "McKnight" at the trial to show that any such requirement as this had been issued, or was in existence, governing British vessels in wartime, and it seems clear that without some verification the statement would hardly be competent or relevant in the present litigation.

But even assuming, for the sake of the argument, that there was such a requirement, and that it governed the conduct of the "McKnight", it still could have no effect on the complete ineffectiveness of Cooney and Kirkpatrick, the two seamen who alternated as lookouts on the "monkey island" prior to the collision.

Cooney, the lookout on duty from 7:00 P. M. until just before 8:00 P.M., was during the hour of his watch looking out, walking athwartships all the time, and he saw the "Ford" several times, the last time being between five and ten minutes before he was relieved. The "Ford" was the only ship he saw during the time he was on watch. It thus appears that he did not see the "Mather" crossing ahead of the "Ford", nor did he see the "Gibson's" approach to the "McKnight", nor the close encounter between the "Gibson" and the "Ford", nor the navigation lights of the "Ford". It is evident, also, that he did not hear the U danger signal sounded by the "Ford" when the "Gibson" was first seen heading for the "Ford's" port side midships. Kirkpatrick, the relieving lookout, on taking over the watch from Cooney, looked out to starboard and saw nothing; he then walked over to the port side and saw the "Gibson" coming towards the "McKnight". He was going to report this ship, but as he went to the voice tube he heard a shout from the wheelhouse "hard to starboard", and did not do so. Neither lookout made any report to Edwards. This plainly was a complete lookout failure.

This lookout failure on the part of Cooney and Kirkpatrick is aggravated by the performance of Edwards, the watch officer of the "McKnight". He had been keeping watch on the port wing of the bridge, but at some time not stated he had gone into the armored wheelhouse, where the only way to see out was through the narrow horizontal slits, or windows, forward and at the sides, and he was there during the two or three minutes just before the collision. While in the wheelhouse he picked up the binoculars to take a look around the horizon, and as he looked ahead he saw the "Mather" crossing from port to starboard. He watched this ship for ten or fifteen seconds, as she passed to starboard, and then started to look for the "Ford", but did not see her. He did, however, see a ship which turned out to be the "Gibson", bearing about two points forward of the "McKnight's" port beam, and steering a crossing course about six points to the right of the "McKnight's" course, and he immediately placed the helm "hard starboard", the port engine "full ahead", and stopped the starboard engine. The collision took place "about thirty seconds" after Edwards had first sighted the "Gibson". Edwards' inattention closely parallels that of the lookouts, for he neither saw nor heard anything which the lookouts failed to see or hear, other than the passing of the "Mather".

There may be a decree holding both the "Mather" and the "McKnight" at fault for the collision, and holding the "Gibson" free from fault. With this determination, it is not necessary at this time to pass on the other questions presented.